PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3074
_____

KAREN BARKES, as administratrix
of the Estate of Christopher Barkes;
ALEXANDRA BARKES; BRITTANY BARKES

v.

FIRST CORRECTIONAL MEDICAL, INC.;
STANLEY TAYLOR; RAPHAEL WILLIAMS;
CERTAIN UNKNOWN INDIVIDUAL EMPLOYEES
OF THE STATE OF DELAWARE DEPARTMENT OF
CORRECTIONS;
CERTAIN UNKNOWN INDIVIDUAL EMPLOYEES
OF FIRST CORRECTIONAL MEDICAL, INC.;
STATE OF DELAWARE DEPARTMENT OF
CORRECTIONS

Stanley Taylor and Raphael Williams,

Appellants

_____

On Appeal from the United States District Court
for the District of Delaware
(District of Delaware Civil No. 1-06-cv-00104)
District Judge:  Honorable Leonard P. Stark

_____

Argued September 24, 2013

Before:  AMBRO, FISHER and HARDIMAN, *Circuit Judges*

(Filed:  September 5, 2014)

Catherine C. Damavandi (ARGUED)
Marc P. Niedzielski
Delaware Department of Justice
820 North French Street
Carvel Office Building, 6th Floor
Wilmington, DE  19801

2

*Counsel for Appellants*

Jeffrey K. Martin (ARGUED)
Martin & Associates
1508 Pennsylvania Avenue
Suite 1C
Wilmington, DE  19806
*Counsel for Appellees*

———

OPINION OF THE COURT

———

FISHER, *Circuit Judge*.

In this appeal, we consider whether two prison administrators are entitled to qualified immunity from an Eighth Amendment claim that serious deficiencies in the provision of medical care by a private, third-party provider resulted in an inmate's suicide.  We agree with the District Court that they are not.  For reasons to be discussed, we will affirm.

I.[1]

A.

Plaintiff-Appellees Karen Barkes, Alexandra Barkes, and Brittany Barkes (collectively, "Appellees") are the widow and children, respectively, of decedent Christopher Barkes ("Barkes").[2] Barkes committed suicide on November 14, 2004, while being held at the Howard R. Young Correctional Institution ("HRYCI") in Wilmington, Delaware, awaiting transportation to the Violation of Probation Center in Sussex County, Delaware. He had been arrested the previous day on an administrative warrant. Barkes was on probation for a March 2004 domestic abuse conviction, and had been arrested for loitering while waiting to purchase drugs. Appellees filed suit against then-Delaware Commissioner of Correction Stanley Taylor, then-Warden of HRYCI Raphael Williams, the Delaware Department of Corrections ("DOC"), and the third-party vendor providing medical services in HRYCI, First Correctional Medical, Inc. ("FCM"). Appellants here are Taylor and Williams.

Barkes was a troubled man with a long history of mental health and substance abuse problems. On March 15, 1997, Barkes killed two people in a car accident while driving drunk. He pleaded guilty to two counts of second-degree vehicular homicide. Seven months after the accident, on

---

[1] Because we are reviewing the District Court's denial of summary judgment on the grounds of qualified immunity, we view all disputed facts in the light most favorable to the party claiming injury. *Wright v. City of Phila.*, 509 F.3d 595, 597 n.1, 599 (3d Cir. 2005).

[2] Karen Barkes appears both in her individual capacity and as administrator of Barkes's estate.

October 31, 1997, Barkes attempted suicide while incarcerated by ingesting an overdose of pills that he had apparently stockpiled. He was incarcerated at HRYCI (also known as Gander Hill Prison), the same facility at which he would eventually commit suicide in 2004.

Barkes served two and a half years in prison, during which time he completed a substance abuse program. He stayed sober for approximately four years before relapsing in December 2003. He entered the Recovery Center for Delaware on December 15, 2003, but could stay for only one week because of limited funding from his insurance provider. On December 21, 2003, police responded to a reported domestic altercation at Barkes's home. After police placed him in handcuffs, he became unconscious and unresponsive. Paramedics were called, who opened Barkes's airways, provided oxygen, and administered drugs to counteract a suspected heroin overdose. Barkes admitted – and the toxicology report in his medical records confirms – that he consumed one and a half pints of vodka and a "bag" of heroin, quantity unspecified. He later characterized this overdose as a suicide attempt.

Shortly before the December 2003 relapse, Barkes checked himself into the Rockford Center in Wilmington, Delaware, where he was diagnosed with post-traumatic stress disorder. David Becker, Barkes's probation officer at the time, opined that Barkes was "[n]ot only . . . a threat to the community, he is also a threat to himself," in a "violation report" dated February 3, 2004. JA at 296.

On September 10, 2004, sixty-five days before his death, Barkes attempted to kill himself twice in one day. During an afternoon house visit by a probation officer, Barkes was found asleep on top of a bottle of gin. He appeared to be

5

extremely intoxicated – he apparently could not recall who he was – and the officer arrested Barkes. Two hours after his arrest, Barkes had a blood alcohol content ("BAC") of .222. Because of his high BAC the officers took Barkes to a hospital, where he admitted to a nurse that he had also consumed forty Tylenol tablets. While being treated, Barkes attempted to kill himself by wrapping an IV cord around his neck. Both incidents were recorded in his probation file.

Barkes received a new probation officer shortly before his death. In notes dated November 9, 2004 – five days before he died – the officer indicated her awareness that Barkes suffered from bipolar disorder, attended one therapy session and six Alcoholics Anonymous meetings each week, and took four medications for his bipolar condition and other mental health problems. The notes also acknowledged three individuals – the record suggests that they were therapists, counselors, and/or social workers – whom Barkes was currently seeing.

Barkes was arrested on November 13, 2004 for violating his probation. At approximately 3:00 p.m. that day, he underwent a medical intake/screening procedure at HRYCI conducted by a licensed practical nurse ("LPN") who was employed by FCM, a private contractor hired to provide medical services in the prison. The intake procedure included a form containing questions about Barkes's mental health, including questions about suicidal ideation. Barkes indicated on the form that he had attempted suicide in 2003 but did not include the 1997 attempt or the two attempts in September 2004. He stated that he had no current suicidal ideation.

The intake procedure also screened for seventeen suicide risk factors. If the inmate checked eight or more factors on a form, or if certain other serious risk factors were

6

present (for example, the arresting officer expressed concern that the inmate was a suicide risk), the on-call physician was to be notified and suicide prevention measures initiated. Barkes answered yes to two of the questions: (1) that he had a psychiatric history; and (2) that he had previously attempted suicide. The LPN completed a standard medical intake form, which included questions as to whether Barkes showed signs of "altered mental status . . . or abnormal conduct." JA at 71. The LPN indicated "no" to both. Barkes also denied having a history of drug abuse. The LPN referred Barkes to mental health services on a "routine" urgency level, based on his psychiatric history and the 2003 suicide attempt.

Barkes was placed alone in a cell in the booking and receiving area. At some point during the evening of November 13, Barkes called his wife Karen. According to Karen, Barkes told her that he "can't live this way anymore," and said that he was going to kill himself. JA at 2, 72. It is undisputed that Karen did not inform the DOC of Barkes's stated intent.

Shortly before 4:00 a.m. on November 14th, in an unrelated incident, another inmate at HRYCI was transferred to the infirmary from his cell and placed on Psychiatric Close Observation, Level II ("PCO II"). Patients placed on PCO II are given a "suicide gown" and are checked every 15 minutes by staff. Appellants' Br. at 10 (citing *Lamb v. Taylor*, No. 08-324, 2011 WL 4006586, at *2 n.1 (D. Del. Sept. 8, 2011) (describing medical care at HRYCI in the context of another lawsuit arising out of a prison suicide)).

At 8:00 a.m. on the 14th, Barkes ate breakfast alone in his cell. Correctional officers observed him lying awake on his bed at 10:45, 10:50, and 11:00 a.m., and none recalled anything unusual about him or any indication that he was

7

suicidal. At 11:35 a.m., when an officer arrived at his cell to deliver his lunch, Barkes was hanging by a sheet from a steel partition. Medical staff responded and Barkes was taken to a hospital, but attempts to resuscitate him were unsuccessful.

## B.

FCM entered into a Health Care Services Contract with DOC on June 17, 2002, and was the contracted medical provider at HRYCI at the time of Barkes's suicide. In that role it was responsible for inmate intake and medical screening. The DOC reviewed FCM's performance in monthly Medical Review Committee ("MRC") meetings, overseen by DOC Bureau Chief of Management Services Joyce Talley. Talley was the DOC's appointed representative for administering the contract with FCM. *See* Del. Code Ann. tit. 11, § 6517(13) (currently codified at Del. Code Ann. tit. 11, § 6517(12)) (requiring that the Commissioner of Correction "[a]dminister[] the medical/treatment services contract, or appoint[] a designee to administer the medical/treatment contract").

As Chief of the DOC Bureau of Management Services, Talley had many responsibilities. She testified that her areas of oversight responsibility included "fiscal, payroll, budgeting, food services for the inmates, health care for the inmates, substance abuse for the inmates, management information systems, purchasing and warehousing, facilities maintenance and construction." JA at 364-65. She further testified that, in each of these areas except for health care, she relied on a "key manager [to do] the day-to-day" oversight. JA at 366. The "key manager" was an official within the DOC, but with respect to health care services Talley relied on FCM and the MRC, testifying that she did not make any assessments regarding FCM's job performance and that no

8

individual working within the DOC "had the knowledge or the background . . . [to] go out to see if the medical care was provided." JA at 367.

The contract outlined standards of care to which FCM must adhere. To the extent that the health care standards of the American Correctional Association and the National Commission on Correctional Health Care ("NCCHC") differed, FCM was to adhere to the higher standard. Taylor testified that he believed that ensuring FCM "deliver[ed] health care in accordance with NCCHC standards" was sufficient to meet his responsibility to deliver health care to the inmate population. JA at 51. Williams testified that he had a responsibility to ensure that HRYCI was in compliance with NCCHC standards, but that he believed he had no personal responsibility to ensure FCM's compliance. JA at 55. Talley also testified that she did not believe it to be her responsibility to ensure FCM's compliance with NCCHC standards. JA at 368 ("Q: Did you believe that it was your responsibility when you served in that role as bureau chief that you reviewed the compliance with the standards set forth by NCCHC? A: No.").

In 1997, NCCHC published standards for use by correctional facilities to screen inmates for physical and mental health problems during the intake process. These standards included a variety of forms to be completed by medical intake staff. The NCCHC altered its standards in 2003, doing away with the forms and instead instituting a narrative recommendation of various mental health warning signs of which all prison staff should be aware and vigilant. Though FCM appears to have been relying on the outdated 1997 forms in 2004 when Barkes was incarcerated, NCCHC accredited HRYCI approximately one year before Barkes's suicide. However, part of Appellees' theory of liability is that

9

not only did FCM fail to implement the newer guidelines as required by its contract, it failed to properly implement the 1997 NCCHC standards. Therefore, it is necessary to discuss the 1997 NCCHC standards for suicide assessment in some detail.

The 1997 NCCHC guidelines provided a number of sample intake forms covering general physical and mental health questions.[3] These included a suicide-specific assessment form that asked questions regarding past and current suicidal ideation, mental health treatment, and recent emotional trauma. JA at 310. There was also a mental health screening form that was to be filled out by the intake staff member. The mental health form instructed the screener to ask the inmate, in pertinent part: "Have you ever felt so bad, so depressed, that you tried to take your own life?"; and "Have you ever taken medication for emotional problems, for mental illness, or for 'nerves?'" JA at 313. The following page of the standards provided criteria for referring an inmate to a mental health professional based on answers given in the mental health screening form, which stated:

> Refer an inmate to mental health staff for assessment if the inmate gives a "Yes" response to ANY question. There are no exceptions to this procedure.

---

[3] For example, the first two questions on the general intake screening form are: "Was inmate a medical, mental health or suicide risk during any prior contact or confinement with department?"; and "Do you believe the inmate is a medical, mental health or suicide risk now?" JA at 309. That form also allows the screener to record behavioral observations about the inmate and whether they suffer from health problems such as heart disease or epilepsy.

> If the inmate gives an affirmative response to question 9,[4] make an immediate referral to mental health staff and make sure continuous "eyes on" supervision is provided until seen by the mental health staff.
>
> Remember, this screening inventory IS NOT your only guide for referral to mental health services. Even if there are all "no" answers, you may still refer the inmate:
>
> - if you suspect that, in spite of the answers, this inmate is experiencing some emotional difficulties;
>
> - if you need additional mental health information on an inmate prior to classification;
>
> - or for reasons not listed here

JA at 314 (emphasis in original).

The 1997 guidelines provided sample protocols to be administered by a qualified mental health professional if the inmate's intake screening triggered referral. JA at 322. The guidelines explicitly required the protocols to be administered by a mental health professional.

Appellees claim, however, that FCM failed to comply with the 1997 NCCHC standards. They argue that the suicide screening form that FCM administered corresponded to the screening form to be used by a mental health professional, but that FCM allowed the form to be administered by an unqualified LPN rather than a qualified mental health

---

[4] Question 9 inquired whether the inmate was currently considering killing himself.

11

professional, as required under NCCHC guidelines. To put it simply, Appellees claim that, if FCM had been in compliance with NCCHC standards, Barkes's "yes" answer to the question "Have you ever attempted suicide?" and his identification of his psychiatric medication would have triggered a referral to a mental health professional. The professional in turn would have instituted increased suicide prevention procedures, thus preventing Barkes's death.

In deposition testimony, Appellants acknowledged that they were aware of the deteriorating quality of FCM's provision of medical services. Williams admitted that FCM's performance had degraded significantly and that he was aware FCM may not have been fulfilling its contractual obligations. JA at 792. He was aware of significant backlogs, that FCM may have been intentionally short-staffing to save money, and that inmate complaints had increased. JA at 792-93. Taylor testified that his responsibility as Commissioner of Correction was to "provide health care delivery to the offender population comparable to that available in the community." JA at 799. He acknowledged that in the period of 2003-2007 audits conducted by the NCCHC had identified deficiencies in healthcare provision in the Delaware prison system. He also suspected that FCM was intentionally leaving positions vacant in order to save money rather than simply having difficulty recruiting and retaining staff. Minutes from a meeting of the MRC on June 17, 2004, at which Williams was present, indicate ongoing problems with the DOC's document management computer system, called "DACS," including that the medical unit at HRYCI was "not putting information into DACS consistently for medical grievances." JA at 809. Talley indicated that FCM was "beyond the borderline of not being in compliance with the contract" and

12

that the MRC would issue a letter of non-compliance at the next meeting if problems with the computer system were not resolved by then. *Id.* Minutes from the MRC's August 26, 2004 meeting indicate that FCM remained non-compliant with respect to implementing the DACS system, and that this issue was to be brought to Taylor's attention. In May 2005, Taylor wrote a letter to FCM indicating that the DOC would be terminating the contract, citing among his reasons "the serious deficiencies in the delivery of health care outlined in the National Commission on Correctional Health Care (NCCHC) audit report dated February 28, 2005." JA at 788.

## C.

On February 16, 2006, Appellees filed a complaint pursuant to 42 U.S.C. § 1983 in the United States District Court for the District of Delaware.

Appellees asserted against Taylor and Williams an Eighth Amendment claim based on deliberate indifference to Barkes's serious medical needs, an Eighth Amendment claim based on a failure to train/wrongful customs, practices, and policies, and a state law wrongful death claim. On February 27, 2008, the District Court granted summary judgment to Appellants. Appellees filed an appeal, *see Barkes v. First Correctional Medical, Inc.*, No. 08-2280 (docketed May 7, 2008), which we dismissed per stipulation of the parties on July 9, 2008.

On May 21, 2008, while the first appeal was pending, the District Court held a show cause hearing on Appellees' motion for default judgment against FCM. At that hearing, the Court granted the motion and granted Appellees leave to amend. They filed a first amended complaint on June 13, 2008, which Appellants moved to strike on the basis that it

13

reasserted claims upon which they had already prevailed on summary judgment. The Court granted the motion to strike on March 30, 2009, but permitted Appellees to file a second amended complaint against Appellants provided that it did not assert any claims from the previous complaint. Appellees filed a second amended complaint on April 9, 2009, which was eventually dismissed.[5] Appellees were permitted to file a third amended complaint only to add an Eighth Amendment failure-to-supervise claim, which was filed on April 22, 2010. Appellants moved to dismiss the third amended complaint on May 6, 2010, and the District Court denied the motion.

On February 27, 2012, the parties filed cross-motions for summary judgment. It was then that Appellants asserted

---

[5] It appears that the first amended complaint was filed in the District Court before we had dismissed Appellees' appeal, which we dismissed while the motion to strike was pending. In the briefing on the motion to strike, the parties discussed the then-pending appeal only to acknowledge that it was premature because claims remained against FCM in the District Court. No party has raised before us now, and we therefore do not consider, whether the District Court was without jurisdiction to grant Appellees leave to file the first amended complaint. *See Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1314 (3d Cir. 1994) (noting the general rule that the filing of an appeal divests a district court of jurisdiction, but with the exception that "a premature notice of appeal does not") (internal quotation marks and citation omitted). If any error existed, it was mooted when the District Court struck the first amended complaint and granted leave to file a second amended complaint.

qualified immunity in a motion for the first time.[6]   The District Court denied both motions for summary judgment, and Appellants filed this appeal pursuant to the collateral order doctrine.

## II.

The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.  We have jurisdiction pursuant to 28 U.S.C. § 1291 and the collateral order doctrine.  The collateral order doctrine allows us to review an interlocutory order "as a 'final decision' if it: '(1) conclusively determine[s] the disputed question, (2) resolve[s] an important issue completely separate from the merits of the action, and (3) [is] effectively unreviewable on appeal from a final judgment.'"  *Blaylock v. City of Phila.*, 504 F.3d 405, 408 (3d Cir. 2007) (alterations in original) (quoting *Johnson v. Jones*, 515 U.S. 304, 310 (1995)).  It is well-established

---

[6] Though it is undisputed that Appellants raised qualified immunity in their answer to the third amended complaint, *see* JA at 210, Appellees devote a substantial portion of their brief to a discussion of Appellants' failure to assert the defense until so late in this litigation. In their briefs, they do not suggest that this is of any legal significance – that Appellants waived the defense, for instance – but only that it is supposedly "revelatory of [Appellants'] mindset" regarding the merits of their qualified immunity argument.  Appellees' Br. at 22.  At oral argument, counsel for Appellees went a step further and asked that we find waiver of qualified immunity.  Because Appellants asserted qualified immunity in their answer, waiver is inappropriate, and whether or not they exhibit confidence in their assertion of qualified immunity is of no relevance to this appeal.  *See Cetel v. Kirwan Fin. Grp.*, 460 F.3d 494, 506 (3d Cir. 2006).

that orders denying qualified immunity at summary judgment are reviewable under the collateral order doctrine "to the extent that denial turns on questions of law." *Bayer v. Monroe Cnty. Children and Youth Serv.*, 577 F.3d 186, 191 (3d Cir. 2009)); *see also Wright v. City of Phila.*, 409 F.3d 595, 599 (3d Cir. 2005) ("Despite the interlocutory nature of qualified immunity rulings, they are reviewable on appeal where the dispute does not turn upon which facts the parties might be able to prove, but, rather, whether or not certain facts showed a violation of 'clearly established' law." (internal quotation marks and citation omitted)).

"On an appeal from a grant or denial of summary judgment, our review is plenary and we apply the same test the district court should have utilized initially." *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009). A court may grant summary judgment only when the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The issue of qualified immunity is generally a question of law, but a genuine dispute of material fact will preclude summary judgment on qualified immunity. *Giles*, 571 F.3d at 326.

III.

A.

1.

Before discussing the District Court's qualified immunity analysis, it is necessary first to consider whether and to what extent our precedent on supervisory liability in the Eighth Amendment context was altered by the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Though we have in the past declined "to wade into the muddied waters of post-*Iqbal* 'supervisory liability,'"

16

*Bistrian v. Levi*, 696 F.3d 352, 366 n.5 (3d Cir. 2012); *see also Argueta v. U.S. Immigration and Customs Enforcement*, 643 F.3d 60, 69-70 (3d Cir. 2011), we find it appropriate to do so now.

Section 1983 provides a cause of action against "every person who," under color of state law, "subjects, or causes to be subjected," another person to a deprivation of a federally protected right. 42 U.S.C. § 1983. It is well-recognized that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Bistrian*, 696 F.3d at 366 (alteration in original) (quoting *Iqbal*, 556 U.S. at 676). Rather, state actors are liable only for their own unconstitutional conduct. *Id.* With this principle in mind, we have previously identified two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates. First, liability may attach if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*, 372 F.3d 572, 586 (3d Cir. 2004) (alteration in original) (quoting *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)). Second, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in the subordinate's unconstitutional conduct. *Id.* (citing *Baker v. Monroe Twp.*, 50 F.3d 1186, 1190-91 (3d Cir. 1995)). "Failure to" claims – failure to train, failure to discipline, or, as is the case here, failure to supervise – are generally considered a subcategory of policy or practice liability. *See* Rosalie Berger Levinson, *Who Will Supervise the Supervisors? Establishing Liability for Failure to Train,*

17

*Supervise, or Discipline Subordinates in a Post-*Iqbal/Connick *World,* 47 Harv. C.R.-C.L. L. Rev. 273, 280 (2012).

In *Sample v. Diecks*, we recognized that "'supervision' entails, among other things, training, defining expected performance by promulgating rules or otherwise, monitoring adherence to performance standards, and responding to unacceptable performance whether through individualized discipline or further rulemaking." 885 F.2d 1099, 1116 (3d Cir. 1989). *Sample* involved an Eighth Amendment claim against a supervisor for implementing deficient policies and being deliberately indifferent to the risk that the policies would result in the deprivation of a constitutional right. *Id.*; *see also Beers-Capitol v. Whetzel*, 256 F.3d 120, 133-34 (3d Cir. 2001) (discussing *Sample*). We developed a four-part test for determining whether an official may be held liable on a claim for a failure to supervise. The plaintiff must identify a supervisory policy or practice that the supervisor failed to employ, and then prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory practice or procedure. *Sample*, 256 F.3d at 1118; *Brown v. Muhlenberg Twp.*, 269 F.3d 205 (3d Cir. 2001). In this Circuit, when a plaintiff seeks to hold a defendant liable under the Eighth Amendment in his or her role as a supervisor, "*Sample*'s four-part test provides the analytical structure . . . , it being simply the deliberate indifference test applied to the specific situation of a policymaker." *Whetzel*, 256 F.3d at 135.

Which brings us to *Iqbal*. Javaid Iqbal sued United States Attorney General John Ashcroft and FBI Director Robert Mueller, high-level Executive Branch officials, under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971). In *Bivens*, the Court "'recognized for the first time an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights.'" *Iqbal*, 556 U.S. at 675 (quoting *Corr. Serv. Corp. v. Malesko*, 534 U.S. 61, 66 (2001)). Iqbal alleged that he was unlawfully detained and subjected to harsh conditions of confinement on the basis of his race, religion, or national origin, as part of a purposefully discriminatory policy of which Ashcroft was the "principal architect" and Mueller was "instrumental" in executing. *Id.* at 669. Iqbal's theory of supervisory liability was that Ashcroft and Mueller could be liable if they had "knowledge [of] and [had] acquiesce[ed] in their subordinates' use of discriminatory criteria to make classification decisions among detainees." *Id.* at 677 (internal citation and quotation marks omitted).

In rejecting Iqbal's claim, the Supreme Court first recognized that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.* at 676. The claim presented in *Iqbal* – discrimination in violation of the First and Fifth Amendments – requires that the plaintiff prove that the defendant acted with a discriminatory purpose, and "purposeful discrimination requires more than 'intent as volition or intent as awareness of consequences.'" *Id.* (quoting *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979), and citing *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 540-41 (1993); *Washington v. Davis*, 426 U.S. 229, 240 (1976)). The Court reasoned that, because such a claim requires that the defendant have acted "'because of,' not merely 'in spite of,'

19

[the action's] adverse effects upon an identifiable group,'" *id.* at 676-77 (some internal quotation marks omitted) (quoting *Feeney*, 442 U.S. at 279), it necessarily followed that Ashcroft and Mueller could be held liable only if they had "adopted and implemented the detention policies at issue . . . *for the purpose of* discriminating on account of race, religion, or national origin," *id.* (emphasis added). The Court rejected Iqbal's argument that supervisory liability could attach based on Ashcroft and Mueller's knowledge of and acquiescence in their subordinates' unconstitutional discrimination, stating: "In a § 1983 suit or a *Bivens* action – where masters do not answer for the torts of their servants – the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id*. at 677. In reaching this conclusion, the Court expressly tied the level of intent necessary for superintendent liability to the underlying constitutional tort. *See id.* at 678 ("In the context of determining whether there is a violation of clearly established law to overcome qualified immunity, purpose rather than knowledge is required to impose *Bivens* liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities.").

This aspect of *Iqbal* has bedeviled the Courts of Appeals to have considered it, producing varied interpretations of its effect on supervisory liability. The dissenters in *Iqbal* believed the majority to be abolishing supervisory liability in its entirety, 556 U.S. at 692-93 (Souter, J., dissenting), and at least one Court of Appeals impliedly confirmed this view, albeit without much in the way of discussion, *see Carnaby v. City of Houston*, 636 F.3d

20

183, 189 (5th Cir. 2011).[7] The Ninth Circuit, on the other hand, has suggested that under *Iqbal* the United States Attorney General could be liable for knowingly "fail[ing] to act in the light of even unauthorized abuses" of the federal material witness statute, insofar as that statute was used as a pretext to detain terrorism suspects despite a lack of probable cause of a criminal violation. *See al-Kidd v. Ashcroft*, 580 F.3d 949, 976 (9th Cir. 2009), *overruled on other grounds*, 131 S. Ct. 2074 (2011) (overruling the Ninth Circuit on the basis of qualified immunity, finding no Fourth Amendment violation, and not reaching the supervisory liability question).

Most courts have gravitated to the center, recognizing that because the state of mind necessary to establish a § 1983 or *Bivens* claim varies with the constitutional provision at issue, so too does the state of mind necessary to trigger liability in a supervisory capacity. The Tenth Circuit, for example, held that, after *Iqbal*, § 1983 liability may attach to "a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor *or her subordinates*) of which 'subjects, or causes to be subjected,'" the plaintiff to a constitutional deprivation, if the supervisor "acted with the state of mind required to establish the alleged constitutional deprivation."

---

[7] In *Carnaby*, the Fifth Circuit affirmed a grant of summary judgment in favor of a police officer whose alleged supervisory failure led other officers to commit an excessive use of force. 636 F.3d at 189. The Court cited *Iqbal* for the proposition that "[u]nder § 1983 . . . a government official can be held liable only for his own misconduct," *id.* (citing *Iqbal*, 556 U.S. at 692-93), but did not consider whether a failure to supervise could in some instances *be* misconduct.

21

*Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (emphasis added). The Court of Appeals in *Dodds* reasoned that such a standard "complies with *Iqbal*'s requirement that § 1983 liability only be imposed upon those defendants whose own individual actions cause a constitutional deprivation because it requires plaintiffs [to] prove each defendant took some act with the constitutionally applicable state of mind that caused the alleged constitutional violation." *Id.* at 1200. The Ninth Circuit agreed with this view in *Starr v. Baca*, seeing "nothing in *Iqbal* indicating that the Supreme Court intended to overturn longstanding case law on deliberate indifference claims against supervisors in conditions of confinement cases." 652 F.3d 1202, 1207 (2011). *See also Whitson v. Stone County Jail*, 602 F.3d 920, 922, 927-28 (8th Cir. 2010) (holding that prison supervisors could be liable on an Eighth Amendment claim "only if they personally displayed deliberate indifference to the risk" of a constitutional deprivation); *Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (holding, post-*Iqbal*, that prison administrators could be liable in a supervisory capacity for a Fourth Amendment violation if their "actions displayed deliberate indifference toward the rights of third parties and had some causal connection to the subsequent tort") (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)).

The Seventh Circuit has also indicated that the mental state required to impose supervisory liability will vary with the underlying constitutional tort. In *T.E. v. Grindle*, the Seventh Circuit held that a school principal could be liable under § 1983 for allowing a subordinate teacher to continue working despite numerous allegations that the teacher was sexually abusing his female students. 599 F.3d 583, 585-87 (7th Cir. 2010). The plaintiff alleged supervisory liability that derived from both substantive due process and equal

protection violations. The Court recognized that *Iqbal* had abrogated its prior precedent allowing plaintiffs to recover from a supervisor who was deliberately indifferent toward a subordinate's purposeful discrimination, because in a discrimination claim *Iqbal* requires that "a plaintiff must show that the supervisor possessed . . . discriminatory intent." *Id.* But this was not so with respect to the substantive due process claim, for which the Court held that "[w]hen a state actor's deliberate indifference deprives someone of his or her protected liberty interest . . . , that actor violates the Constitution, regardless of whether the actor is a supervisor or subordinate." *Id.* at 591. The Court thus recognized that the mental state necessary for supervisory liability tracks with the mental state required for the underlying tort. *See also Vance v. Rumsfeld*, 701 F.3d 193, 204 (7th Cir. 2012) (en banc).

We do not read *Iqbal* to have abolished supervisory liability in its entirety. Rather, we agree with those courts that have held that, under *Iqbal*, the level of intent necessary to establish supervisory liability will vary with the underlying constitutional tort alleged. In this case, the underlying tort is the denial of adequate medical care in violation of the Eighth Amendment's prohibition on cruel and unusual punishment, and the accompanying mental state is subjective deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 847 (1994). *Iqbal* held that state officials are liable only for their *own* unconstitutional actions. The essence of the type of claim we approved in *Sample* is that a state official, by virtue of his or her *own* deliberate indifference to *known* deficiencies in a government policy or procedure, has allowed to develop an environment in which there is an unreasonable risk that a constitutional injury will occur, and that such an injury *does* occur. Liability in such a situation is, as *Iqbal* requires, imposed not vicariously but based on the

23

supervisor's own misconduct, because to exhibit deliberate indifference to such a situation is a culpable mental state under the Eighth Amendment. *See Starr*, 652 F.3d at 1207 ("[W]hen a supervisor is found liable based on deliberate indifference, the supervisor is being held liable for his or her own culpable action or inaction, not held vicariously liable for the culpable action or inaction of his or her subordinates."). Accordingly, we hold that the standard we announced in *Sample* for imposing supervisory liability based on an Eighth Amendment violation is consistent with *Iqbal*. We leave for another day the question whether and under what circumstances a claim for supervisory liability derived from a violation of a different constitutional provision remains valid.

2.

Our dissenting colleague disagrees with our conclusion that *Sample* has survived *Iqbal*. In his view, a supervisor can be held liable under the Eighth Amendment only if he committed an affirmative "action[]," was "personal[ly] involve[d] in his subordinates' misfeasance," and acted with "intentional . . . deliberate indifference." Dis. Op. at 9, 19 (internal quotation marks omitted). Our colleague claims that his position recognizes that "there's no special rule of liability for supervisors" and that "the test for them is the same as the test for everyone else." *Id.* at 20 (internal quotation marks omitted) (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327-28 (10th Cir. 2010)). But in fact the opposite is true: his test would immunize from liability prison officials who were deliberately indifferent to a substantial risk that inmates' serious medical conditions were being mistreated or not treated at all. This would subvert the Supreme Court's command that *any* prison official who, "acting with deliberate indifference, expose[s] a prisoner to a sufficiently substantial

24

risk of serious damage to his future health," violates the Eighth Amendment. *Farmer*, 511 U.S. at 844 (internal quotation marks and citations omitted). Simply because an official may have a senior position in the DOC does not make him free to ignore substantial dangers to inmate health and safety. *Id.* at 842; *Grindle*, 599 F.3d at 590 ("When a state actor's deliberate indifference deprives someone of his or her protected liberty interest in bodily integrity, that actor violates the Constitution, regardless of whether the actor is a supervisor or subordinate, and the actor may be held liable for the resulting harm.").

Treating supervisors and subordinates equally under the Eighth Amendment does not mean ignoring the different ways in which each type of officer can, with deliberate indifference, expose inmates to constitutional injury. We think our dissenting colleague fails to recognize this fact, and in doing so makes three significant analytical errors. We address each below.

*i.*

First, the Dissent claims that for a supervisor to be liable under § 1983, he must have taken a "deliberate, intentional act . . . to violate the plaintiff's legal rights." Dis. Op. at 12 (quoting *Porro*, 624 F.3d at 1327-28). The Dissent draws this principle primarily from the Tenth Circuit's opinion in *Porro*, which we have cited with approval for its discussion of the mental state required to make out a claim of supervisory liability. But on this particular point the Dissent's reliance is off-base. *Porro* involved an allegation of excessive force by an officer, for which the plaintiff also sued the Sheriff (and his successor) as supervisor. 624 F.3d at 1324-25. In affirming the district court's grant of summary judgment to the Sheriff, the Tenth Circuit began by

25

identifying the precise constitutional tort at issue: the use of excessive force in violation of the due process clause. *Id*. at 1326. The court stated that for a supervisor to be liable, he must have committed a "deliberate, intentional act." *Id.* at 1327-28. Importantly, it made this statement in the context of an excessive force claim, which meant that "the focus [was] on the force the supervisor used or caused to be used, the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else." *Id.* at 1328 (emphasis omitted). But excessive force claims are different than conditions of confinement claims: instead of deliberate indifference, they require a plaintiff to show that "officials applied force 'maliciously and sadistically for the very purpose of causing harm,' or . . . with 'a knowing willingness that [harm] occur.'" *Farmer*, 511 U.S. at 835-36 (quoting *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992)). Under the rule we derive from *Iqbal* – that the mental state necessary for supervisory liability will vary with the substance of the underlying constitutional tort – it makes sense that the Tenth Circuit would require deliberate action in that case.

The Dissent's position neglects the black-letter principle that the type of Eighth Amendment claim alleged here can be shown by an act *or an omission*. *See Farmer*, 511 U.S. at 835 ("[T]he cases are . . . clear that [the deliberate indifference standard] is satisfied by something less than acts *or omissions* for the very purpose of causing harm or with knowledge that harm will result" (emphasis added)); *Estelle v. Gamble*, 429 U.S. 97, 106 (1976) ("In order to state a cognizable claim [under the Eighth Amendment], a prisoner must allege acts *or omissions* sufficiently harmful to evidence deliberate indifference to serious medical needs." (emphasis added)). What the Dissent attempts to do is shoehorn into the

Eighth Amendment the deliberate-act requirement adopted in our state-created-danger jurisprudence. In that context, we have held that "[l]iability . . . [must be] predicated upon the states' *affirmative acts* which work to the plaintiff's detriment in terms of exposure to danger. It is the *misuse of state authority, rather than a failure to use it*, that can violate the Due Process Clause." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008) (third alteration added; emphasis in original) (quoting *Bright v. Westmoreland Cnty.*, 443 F.3d 276, 282 (3d Cir. 2006)).[8] The reason for this requirement is that the Government is not generally required to "guarantee [a] certain minimal level[] of safety and security" to its citizens. *Bright*, 443 F.3d at 280 (quoting *DeShaney v. Winnebago Cnty. Soc. Servs. Dep't.*, 489 U.S. 189, 195-96 (1989)). But this principle does not apply once the Government takes custody of the citizen and deprives him of his liberty.

> [Our cases] stand only for the proposition that when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety

---

[8] The elements of a properly pleaded state-created-danger claim are: "(1) the harm ultimately caused to the plaintiff was foreseeable and fairly direct; (2) the state-actor acted in willful disregard for the plaintiff's safety; (3) there was some relationship between the state and the plaintiff; and (4) the state-actor used his authority to create an opportunity for danger that otherwise would not have existed." *Phillips*, 515 F.3d at 235.

and general well-being. . . . The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.

*Id.* at 280-81 (alteration in original) (quoting *DeShaney*, 489 U.S. at 199-200). The Dissent cites *Grindle* in support of its claim that an affirmative act is required, and he is correct that this case upheld a supervisory liability claim for substantive due process deliberate indifference that was predicated upon an official's attempt to "conceal[] reports of abuse and creat[e] an atmosphere that allowed abuse to flourish." 599 F.3d at 590. Certainly, an affirmative act such as concealment of wrongdoing could satisfy the deliberate indifference standard, but it is not necessary. Under the Eighth Amendment, prison officials, from the bottom up, may be liable if by act or omission they display a deliberate indifference to a known risk of substantial harm to an inmate's health or safety. *Farmer*, 511 U.S. at 843. The omission alleged here is the deliberately indifferent failure to enforce FCM's compliance with proper suicide-prevention protocols, as required under FCM's contract with the DOC. As we will discuss, there is a material factual dispute on this point.

*ii.*

The Dissent would require both that the supervisor "personally display[ed] deliberate indifference," Dis. Op. at

28

20 (internal citation and quotation marks omitted), and that the supervisor was "personal[ly] involve[d] in his subordinates' misfeasance," *id.* at 9. With respect to the former observation, we agree, which is why our decision requires subjective deliberate indifference on the part of the offending officer. *See* Part III.A.1, *supra*. With respect to the latter, the Dissent misinterprets the rules for Eighth Amendment liability under *Farmer*.

The Dissent asserts that, by affirming *Sample*'s vitality post-*Iqbal*, our decision wrongly applies an *objective*, rather than a *subjective*, test for evaluating deliberate indifference, in contravention of *Farmer*. This criticism is unpersuasive for two reasons. First, the premise upon which the Dissent's argument rests – that "*Sample*'s objective quality is patent," *see* Dis. Op. at 19 – is far from clear. *Sample* expressly constructed its test for deliberate indifference around *what* the officer knew and *how* the officer reacted to that knowledge. *Sample*, 885 F.2d at 1118 (asking whether the officer "*was aware* that this unreasonable risk existed" and whether that officer "*was indifferent* to that risk" (emphasis added)). This is clearly a subjective test as required by *Farmer*, a conclusion bolstered by our recitation of the *Sample* test in *Brown*, a case that post-dates *Farmer* and yet approves *Sample*. *See Brown*, 269 F.3d at 216. Far from being patently objective, *Sample*'s test is explicitly concerned with the officer's subjective knowledge.

The origin of the Dissent's discontent may be *Sample*'s reference to *City of Canton v. Harris*, 489 U.S. 378 (1989). In *City of Canton*, the Supreme Court held that a municipality "can be liable for failure to train its employees when the municipality's failure shows 'a deliberate indifference to the rights of its inhabitants.'" *Farmer*, 511 U.S. at 840 (quoting *City of Canton*, 489 U.S. at 389). In

*Farmer*, the Court stated that *City of Canton*, which allowed liability to attach based on "obviousness or constructive notice," created an objective test for deliberate indifference that was inappropriate in the Eighth Amendment context. *Farmer*, 511 U.S. at 841. To be sure, *Sample* stated that it derived its test "[b]ased on *City of Canton*," 885 F.2d at 1118, but the *actual* test that it articulated clearly sounds in subjectivity.

The Dissent cites a passage of *Sample* in which we said that "there are situations in which the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it." 885 F.2d at 1118; Dis. Op. at 19. In fairness to our colleague, one could read this as suggesting that an objective test *might* be applicable in situations where evidence of the officer's knowledge and intent was absent. But one could also read this statement as recognizing that the requisite mental state can be proved by circumstantial evidence. *Cf. Farmer*, 511 U.S. at 842 ("Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder *may conclude* that a prison official knew of a substantial risk from the very fact that the risk was obvious." (emphasis added)).

At any rate, this brings us to the second reason that the Dissent's objection fails: the test that *we* derive from *Sample* and apply in this case cannot be described as anything but subjective, and is thus entirely consistent with *Farmer*. Moreover, the Dissent's statement that the District Court has already determined that "'a reasonable factfinder could not

30

determine that Defendants were deliberately indifferent to the risk of suicide,'" Dis. Op. at 18 (quoting JA at 15), is a red herring because that determination was made in reference to Count I of the third amended complaint, which alleged that Appellants were deliberately indifferent to Barkes's serious medical needs as an individual. That is a very different claim than the supervisory liability claim contained in Count V and that we are allowing to proceed. To the extent that *Sample* approved, in some circumstances, an objective test for determining a prison official's Eighth Amendment deliberate indifference, that portion of *Sample* has been abrogated by *Farmer* and it is not the test we apply today.

Recognizing that our test does, in fact, require an official's subjective deliberate indifference, the Dissent pivots and claims that the plaintiff must nonetheless plead that the supervisor was "personal[ly] involve[d] in his subordinates' misfeasance." Dis. Op. at 9. The Dissent's rule would have the practical effect of requiring that a supervisor have personal knowledge of an individual inmate, that inmate's particular serious medical need, and of the prison staff's failure to treat that need, before the supervisor could ever be held liable for deliberate indifference. But *Farmer* itself recognized that a prison official cannot avoid liability under the Eighth Amendment simply "by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to" suffer a constitutional injury. 511 U.S. at 843.

> The question under the Eighth Amendment is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious damage to his future

31

health," and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk. If, for example, prison officials were aware that inmate "rape was so common and uncontrolled that some potential victims dared not sleep [but] instead . . . would leave their beds and spend the night clinging to the bars nearest the guards' station," it would obviously be irrelevant to liability that the officials could not guess beforehand precisely who would attack whom.

*Id.* at 843-44 (internal citations omitted) (quoting *Helling v. McKinney*, 509 U.S. 25, 33, 35 (1993); *Hutto v. Finley*, 437 U.S. 678, 681-82 n.3 (1978)). A high-ranking prison official can expose an inmate to danger by failing to correct serious known deficiencies in the provision of medical care to the inmate population. That the official had no specific knowledge of any particular inmate or the failure of subordinate officials to treat that inmate's serious medical condition is irrelevant.

The Dissent suggests that *Nelson v. Correctional Medical Services*, 583 F.3d 522 (8th Cir. 2009) (en banc), contradicts our analysis, but in fact that case supports our position. There, an inmate sued a guard and a prison director

32

under the Eighth Amendment because her legs had been shackled during labor, causing her injury. *Id.* at 525-27. She alleged that the prison director had violated her rights "by failing to ensure that proper policies and customs were implemented with respect to the restraint of female inmates in labor." *Id.* at 534-35. The Eighth Circuit stated that the director could be liable "if he personally displayed deliberate indifference to the hazards and pain resulting from shackling an inmate *such as* [*the plaintiff*] during the final stages of labor."[9] *Id.* (emphasis added) (citing *Farmer*, 511 U.S. at 842). The court then engaged in a lengthy analysis of the policies and procedures in place at the time, and concluded that they "suggest[ed] administrative concern for the health and safety of pregnant inmates." *Id.* at 536. Under the Eighth Circuit's analysis, the outcome would have been different had the policies and procedures in place been constitutionally inadequate and had there been evidence of the prison director's deliberate indifference to that fact. *Nelson*'s analysis also suggests that the director could have been held liable if, notwithstanding the adequacy of the policies, he had been deliberately indifferent to a widespread failure to properly *implement* the policies. *See id.* at 536 (recognizing the adequacy of the policies and stating that "[w]ithout *further allegation or evidence of deliberate indifference*," the Eighth Amendment claim must fail (emphasis added)). The latter situation is analogous to that before us today.

---

[9] Contrary to the Dissent's implication, *see* Dis. Op. at 13, the prison director's lack of personal knowledge of the plaintiff and his absence at her delivery were merely undisputed facts in the case. *Nelson*, 583 F.3d at 535. No part of the court's analysis turned on these facts.

33

What the Dissent fundamentally fails to recognize is that there are different ways that prison officials can be responsible for causing an inmate harm. Dissenting in *Vance*, Judge Hamilton adroitly provided the following hypothetical:

> "[S]uppose . . . that a local police chief or even the FBI director issued a policy that authorized the use of deadly force against any fleeing subject. The policy itself would be unconstitutional under *Tennessee v. Garner*[, 471 U.S. 1 (1985)]. The chief or director who authorized that unconstitutional use of force could certainly be held personally responsible under section 1983 or *Bivens* to a person shot by an officer following the policy.

*Vance*, 701 F.3d at 223 (Hamilton, J., dissenting). No less here, where there is evidence of serious inadequacies in the provision of adequate medical care for inmates, and there is evidence that prison officials were aware of the problem and yet indifferent to the risk that an inmate would suffer a constitutional injury, they can be held liable under § 1983 for violating the Eighth Amendment

*iii.*

Our final point of disagreement with the Dissent is in his articulation of the deliberate indifference standard itself. The Dissent claims that we err in failing to apply an "intentional version of deliberate indifference." Dis. Op. at

34

19. But his formulation of deliberate indifference is entirely inconsistent with Supreme Court precedent.

We derive the test for establishing Eighth Amendment deliberate indifference from *Sample* and from the Supreme Court's decision in *Farmer*. While the Dissent is correct that Appellees do not allege that Appellants took an intentional act to cause inadequate medical care for inmates, this is a straw-man argument because under *Farmer* they are not *required* to make that allegation. *Farmer* stated that although "deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." 511 U.S. at 835. Deliberate indifference falls "somewhere between the poles of negligence at one end and purpose or knowledge at the other." *Id*. at 836. "[A]n Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." As we will discuss *infra*, there remains a genuine dispute of material fact over whether

Appellants displayed deliberate indifference under this standard.[10]

## B.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). The qualified immunity analysis is thus composed of two constituent questions: first, whether the plaintiff suffered a deprivation of a constitutional or statutory right; and second, if so, whether that right was "clearly established" at the time of the alleged misconduct. If the answer to either question is "no," qualified immunity applies.

---

[10] The Dissent draws its "intentional" deliberate indifference test from *Vance*. *Vance* stated, in discussing supervisory liability post-*Iqbal*, that "[d]eliberate indifference to a known risk is a form of intent," but that in order "to show *scienter* by the deliberate-indifference route, a plaintiff must demonstrate that the public official knew of risks with sufficient specificity to allow an inference that inaction is designed to produce or allow harm." 701 F.3d at 204. We think *Vance* is distinguishable because that case did not consider an Eighth Amendment claim. Before reaching the question of supervisory liability, the Seventh Circuit considered whether it would recognize a new *Bivens* remedy against military personnel who mistreat detainees in violation of the Detainee Treatment Act, 10 U.S.C. § 801 note and 42 U.S.C. §§ 2000dd to 2000dd-1, and potentially one or more treaties. 702 F.3d at 198. The allegation involved violation of a federal statutory right rather than the Eighth Amendment, and so the mental state need not have matched that which we apply today.

*Id.* Deciding which question to address first is within the Court's sound discretion. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

1.

A right is "clearly established" if, at the time of the alleged deprivation, "'[t]he contours of [the] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *al-Kidd*, 131 S. Ct. at 2083 (second alteration in original) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). Crucial to the "clearly established" inquiry is the level of generality at which the right is defined. A constitutional right is not "clearly established simply because of the existence of a broad imperative like the one against 'unreasonable . . . seizures,'" *Schneyder v. Smith*, 653 F.3d 313, 329 (3d Cir. 2011), but nor must there be "a case directly on point [if] existing precedent . . . [has] placed the statutory or constitutional question beyond debate," *al-Kidd*, 131 S. Ct. at 2083 (citing *Anderson*, 483 U.S. at 640). Rather, the asserted right must be sufficiently bounded that it gives "practical guidance" to officials on the ground. *See* John C. Jeffries, Jr., *What's Wrong with Qualified Immunity?*, 62 Fla. L. Rev. 851, 854 (2010). Put another way, the right asserted cannot be so abstract that *any* transgression violates a clearly established right, thereby evaporating "the balance . . . between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties." *Anderson*, 483 U.S. at 639 (internal quotation marks omitted) (quoting *Davis v. Scherer*, 468 U.S. 183, 195 (1984)). The "ultimate question" in the qualified immunity analysis "is whether the defendant had "'fair warning" that his conduct deprived his victim of a constitutional right.'" *Schneyder*,

653 F.3d at 329 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

The "clearly established" game is won or lost on how broadly or narrowly one defines the right at issue. Appellants attempt to atomize the asserted right into oblivion by defining it narrowly as an inmate's right to "supervision of the medical vendor by the prison administrators," for which they assert that "[t]here is no case law establishing that a government entity is responsible for monitoring a medical provider under Section 1983." Appellants' Br. at 19. There are two problems with this characterization. First, its myopia runs directly contrary to the Supreme Court's oft-repeated admonition that "a case directly on point" is not required for a right to be clearly established. *See al-Kidd*, 131 S. Ct. at 2083. Second, this argument hinges entirely on the outsourcing of prison medical care to a private, third-party provider. Appellants do not argue that they have no responsibility to supervise state-employed correctional staff such as guards, or that they *would* have no responsibility to supervise the medical staff were it composed of state employees rather than private contractors. Rather, their argument depends entirely on the Court finding that there is a difference of constitutional import between the two. No reasonable prison administrator could believe that hiring a private contractor to provide a constitutionally required service would allow them to abdicate their constitutional supervisory duties. Yet, culled to its essence, that is Appellants' argument.

Even if we were to accept the manner in which Appellants would particularize the asserted right, they have nonetheless failed to show a lack of clarity in the law. They rely on our decision in *Spruill v. Gillis*, in which an inmate in a Pennsylvania prison brought a § 1983 claim against, among

38

other individuals, the Unit Manager of the Restricted Housing Unit, alleging that as a result of his deliberate indifference the plaintiff was injured by an untreated or inadequately treated back problem. 372 F.3d 218, 222 (3d Cir. 2004). In affirming dismissal of the complaint against the non-medical official for failure to state a claim, we held:

> If a prisoner is under the care of medical experts . . . , a non-medical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison. Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on. Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor. Moreover, under such a regime, non-medical officials could even have a perverse incentive *not* to delegate treatment responsibility to the very physicians most likely to be able to help prisoners, for fear of vicarious liability.

*Id.* at 236.

Appellants rely on this language to argue that, at the time of Barkes's suicide, it was not clearly established that they, as non-medical prison administrators, had a constitutional supervisory duty over the medical staff. But in the very next line of *Spruill* we stated that "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the

39

Eighth Amendment scienter requirement of deliberate indifference." *Id.* Dismissal was proper in *Spruill* because the plaintiff had failed to plead facts suggesting that the official was aware of the alleged inadequacies in medical care, not because prison administrators are categorically exempt from a supervisory role over medical personnel. *Id.* at 236-37 & n.12. And moreover, there is nothing in *Spruill* supporting Appellants' contention that there is a difference of constitutional import between state-employed and privately contracted medical staff. Appellants' argument that the law was hazy with respect to their supervisory duty over prison medical staff is thus belied by the very case upon which they rely. *See* Appellants' Br. at 20 (conceding that *Spruill* was "[t]he clearly established" law at the pertinent time).[11]

With that said, we think that the right Appellees assert, properly defined, is this: an incarcerated person's right to the proper implementation of adequate suicide prevention protocols.[12] This right is clearly established in our case law, and was so at the time of Barkes's suicide. It is beyond

---

[11] The Dissent asserts that we have not "address[ed] Taylor and Williams's argument that there is no clearly established right to supervision over those charged with implementing suicide prevention protocols." Dis. Op. at 24-25. This is a puzzling disagreement because, as previously demonstrated, we have discussed and rejected their attempt to characterize the right in such a manner, and noted that, even were we to accept it, *Spruill* forecloses their argument.

[12] The District Court defined the pertinent right as Barkes's "constitutional right to adequate medical care." JA at 21. While we agree with the District Court's ultimate ruling on qualified immunity, we think that this characterization fails to sufficiently particularize the asserted right.

40

dispute that the cruel and unusual punishments clause of the Eighth Amendment, incorporated by virtue of the Fourteenth, obliges the States to provide adequate medical care for the incarcerated. *See Estelle*, 429 U.S. at 104. This is so because "[p]risoners retain the essence of human dignity inherent in all persons." *Brown v. Plata*, 131 S. Ct. 1910, 1928 (2011). Prisoners, because of their incarceration, have lost the means to provide for themselves, and therefore the prisons that house them are constitutionally bound to provide sustenance and adequate physical and mental health care. *Id.*

At the time of Barkes's suicide, we had long recognized that an inmate's "particular vulnerability to suicide" is a serious medical need that prison officials may not recklessly disregard. *Colburn v. Upper Darby Twp.*, 838 F.2d 663, 669 (3d Cir. 1988) (*Colburn I*), *abrogated on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163 (1993). In *Colburn I*, we examined for the first time whether a prisoner's suicide can give rise to liability under § 1983. We began by examining cases in which the plaintiff was the victim of violence by persons other than the defendant-officials, and drew from that precedent the conclusion that "where prison officials infringed a liberty interest by intentional conduct, gross negligence, or reckless indifference, or an established state procedure, the matter is actionable under section 1983." *Id.* at 667-68 (citing *Commonwealth Bank & Trust Co. v. Russell*, 825 F.2d 12 (3d Cir. 1987); *Davidson v. O'Lone*, 752 F.2d 817 (3d Cir. 1984) (en banc), *aff'd sub nom. Davidson v. Cannon*, 474 U.S. 344 (1986)). We saw "no reason not to apply a similar construction of section 1983 when the acts causing the injury are those of the prisoner herself." *Id.* at 668.

We drew additional guidance from the Supreme

41

Court's decision in *Hudson v. Palmer*, 468 U.S. 517 (1984). *See Colburn I*, 838 F.2d at 668-69. In *Hudson*, the Supreme Court approved of searches of inmates and their cells to discover contraband in order to not only prevent violence against correctional staff and other prisoners but also to prevent suicides. *Hudson*, 468 U.S. at 526 (recognizing that suicide was a significant concern in correctional institutions). Finding particular significance in "the [*Hudson*] Court's statement that prison administrators 'are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves,'" *Colburn I*, 838 F.2d at 668 (quoting *Hudson*, 468 U.S. at 526), we held that when custodial officials "know or should know of the particular vulnerability to suicide of an inmate, then the Fourteenth Amendment imposes on them an obligation not to act with reckless indifference to that vulnerability," *id.* at 669.[13]

---

[13] We also relied on the Fifth Circuit's decision in *Partridge v. Two Unknown Police Officers*, 791 F.2d 1182 (5th Cir. 1986). *Partridge* was one of the first cases to extend the analysis of *Estelle* to prison suicide cases. Writing for the Court, Judge Wisdom observed:

42

We further elucidated this issue in *Colburn v. Upper Darby Township*, 946 F.2d 1017 (3d Cir. 1991) (*Colburn II*). In *Colburn II*, we explained that one of the principal "theoretical underpinnings" in *Colburn I* was the Supreme Court's ruling in *Estelle*, which established that prison administrators "violate the Eighth Amendment's proscription of cruel and unusual punishment when they exhibit 'deliberate indifference to serious medical needs of prisoners.'" *Id.* at 1023 (quoting *Estelle*, 429 U.S. at 104)). We reemphasized in *Colburn II* that a "particular vulnerability to suicide" is a serious medical need encompassed within the rule of *Estelle*. *Id.* (citing

> [The due process clause imposed on the custodial officials] a duty, at a minimum, not to be deliberately indifferent to Partridge's serious medical needs. A serious medical need may exist for psychological or psychiatric treatment, just as it may exist for physical ills. A psychological or psychiatric condition can be as serious as any physical pathology or injury, especially when it results in suicidal tendencies. And just as a failure to act to save a detainee from suffering from gangrene might violate the duty to provide reasonable medical care absent an intervening legitimate government objective, failure to take any steps to save a suicidal detainee from injuring himself may also constitute a due process violation . . . .

*Id.* at 1187 (quoted in *Colburn I*, 838 F.2d at 669).

43

*Monmouth Cnty. Corr. Inst. Inmates v. Lanzaro*, 834 F.2d 326 (3d Cir. 1987)).[14]

This body of precedent places it "beyond debate," *al-Kidd*, 131 S. Ct. at 2083, that appropriate suicide-preventive measures are a required component of the Constitution's command that prison administrators provide adequate mental and physical health care for inmates. Our decision in *Spruill* gives "fair warning," *Schneyder*, 653 F.3d at 329, that non-medical prison officials may "be chargeable with the Eighth Amendment scienter requirement of deliberate indifference" when they possess actual knowledge or have reason to believe that prison medical staff are mistreating or failing to treat inmates' serious medical conditions. *Spruill*, 372 F.3d at 236. Accordingly, we hold that the right Appellees assert – an incarcerated person's right to the proper implementation of

---

[14] We note that the District Court cited *Woloszyn v. County of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005), in support of its holding that Barkes had alleged the violation of a clearly established right. *See* JA at 19 n.5. We reiterated in *Woloszyn* that a vulnerability to suicide is a serious medical need. 396 F.3d at 319-20. However, *Woloszyn* post-dates Barkes' 2004 death, and accordingly is not relevant for purposes of determining the state of the law at the pertinent time. *See Leveto v. Lapina*, 258 F.3d 156, 162 (3d Cir. 2001) ("'[I]n the light of pre-existing law the unlawfulness must be apparent'" (quoting *Anderson*, 483 U.S. at 640)). Nonetheless, as we discuss above, our decisional law in place at the time of Barkes' death suffices to meet the clearly established inquiry.

adequate suicide prevention protocols – was clearly established at the time of Barkes's suicide.[15]

## 2.

The first prong of the qualified immunity analysis (though we address it second here) asks whether the plaintiff suffered a deprivation of a constitutional or statutory right. A finding of qualified immunity grants immunity not only from liability, but from the burdens of litigation itself. We have recognized that "'the determination of qualified immunity must be made at an early stage in the litigation'" – often in a pre-answer motion to dismiss. *See Ball v. Famiglio*, 726 F.3d 448, 461 (3d Cir. 2013) (quoting *Vaughn v. U.S. Small Bus. Admin.*, 65 F.3d 1322, 1326 (6th Cir. 1995)). We thus often analyze qualified immunity without the benefit of a factual record. However, in this case Appellants asserted qualified immunity in a motion for summary judgment. While "[t]he issue of qualified immunity is generally a question of law, . . . a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles*, 571 F.3d at 326 (citing *Deary v. Three Un-Named Police Officers*, 746 F.2d

---

[15] The Dissent makes one final objection to this analysis, claiming that by defining the right to include the "proper implementation" of suicide prevention protocols we have "plainly violate[d] the basic proposition that the Eighth Amendment does not impose liability for negligence." Dis. Op. at 26. We have not. Nothing in our definition of the right at issue – or in our opinion more broadly – remotely suggests that a mere negligent failure to properly implement suicide prevention protocols would be sufficient to trigger liability. A *recklessly indifferent* failure to properly implement such protocols, however, may very well trigger Eighth Amendment liability.

185, 192 (3d Cir. 1984)). Based upon our review of the summary judgment record, we find that there exist genuine disputes of material fact that preclude a finding of qualified immunity for Appellants.

As we noted previously, *Sample*'s four-part test provides the rubric for evaluating whether supervisors are liable under § 1983 for deliberate indifference. *See Whetzel*, 256 F.3d at 134-35. To hold a supervisor liable for such an Eighth Amendment violation, the plaintiff must identify a supervisory policy or procedure that the supervisor defendant failed to implement, and prove that: (1) the policy or procedures in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation; (2) the defendant-official was aware that the policy created an unreasonable risk; (3) the defendant was indifferent to that risk; and (4) the constitutional injury was caused by the failure to implement the supervisory procedure. *Brown*, 269 F.3d at 216 (discussing *Sample*). The District Court found that disputed factual issues existed as to each of these four elements. We agree with its analysis.

Appellees claim that Taylor and Williams should have enforced FCM's compliance with their contractual obligations, specifically by requiring FCM to adhere to up-to-date NCCHC standards, by properly administering the standards to which they adhered, and by requiring mental health screenings to have been conducted by a qualified mental health professional rather than an unqualified LPN,

thus satisfying *Sample*'s threshold requirement.[16] Record evidence indicates a material factual dispute as to whether FCM's suicide prevention procedures, coupled with DOC's supervision of FCM (or lack thereof), created an unreasonable risk of a constitutional violation. First, there is evidence that FCM's suicide prevention screening practices were not in

[16] In Count V of the third amended complaint, Appellees alleged that Taylor and Williams "failed to supervise and/or monitor the activities of FCM . . . including, but not limited to, the failure to insure the proper evaluation of [Barkes's] psychological condition in light of his responses to intake inquiries advising of his prior suicide attempt, and the failure to insure that appropriate suicide-prevention observation of and/or restrictions upon Mr. Barkes occurred in the period prior to an evaluation by a fully qualified medical provider." JA at 170. They further alleged that "the intake form filled out by Mr. Barkes indicated a previous suicide attempt in December of 2003, and the presence of psychological problems and indications of his usage of psychotropic medication, yet he was not placed under heightened surveillance," and that "the intake form, after having been filled out by Mr. Barkes, was reviewed only by an FCM licensed practical nurse prior to the assignment of Mr. Barkes to a virtually unsupervised booking and receiving area," and that "the intake form on which so much reliance was placed by the DOC and FCM had been removed by the NCCHC from its 2003 'Standards for Health Services in Prisons' because the NCCHC had found that prison administrators were relying too heavily on such forms instead of implementing the procedures described and recommended in the text of the 'Standards for Health Services in Prisons.'" JA at 171.

47

compliance with NCCHC standards, as required by their contract with the DOC, insofar as FCM was relying on out-of-date NCCHC guidelines and failed even to properly implement the standards upon which it was relying. Specifically, the intake form administered to Barkes was designed to be used by a qualified mental health professional, but instead was administered by an unqualified LPN. Appellees claim that, had the proper procedures been followed, Barkes's answer regarding a previous suicide attempt and his use of certain medications would have triggered a referral to a mental health professional. While the NCCHC apparently accredited HRYCI about one year before Barkes's death, that is simply one fact among many that the factfinder will have to consider. Second, the evidence also suggests that FCM lacked access to Barkes's probation records, and that if they had such access they would have been aware of his lengthy history of mental health problems and suicide attempts, and may have placed Barkes under heightened suicide prevention measures. Third, there is evidence that FCM was intentionally short-staffing to drive up profits. Fourth, evidence suggests that DOC's dilatory manner of supervision allowed FCM's provision of services to degrade. Joyce Talley, the DOC official tasked with ensuring FCM's compliance with the contract, did not assess FCM's provision of medical care to the inmates,[17] claimed

---

[17] *See, e.g.,* JA at 367 ("Q: Did you make any assessments of the job they [FCM] were doing providing medical care for the inmates? A: I personally did not, no."); *id.* ("Going back to my question regarding the assessment of the services provided by the independent vendor FCM, was there anyone from the Department of Correction who made any such assessment? A: There was no one that had the knowledge or

48

that it was not her responsibility to ensure FCM's compliance with NCCHC standards, and stated that she largely relied on FCM to police itself.[18] Based on the record before us, a reasonable jury could find that FCM's policies and procedures in place at the time of Barkes's suicide created an unreasonable risk of a constitutional deprivation and that Appellants' manner of supervising FCM further exacerbated the risk.

Appellants stated in deposition testimony that they knew that the quality of FCM's provision of medical services was degrading, with both Appellants acknowledging awareness of intentional short-staffing and Williams acknowledging awareness of FCM's contractual non-compliance with respect to implementing the document management computer system. Taylor's termination letter to FCM indicates his awareness of FCM's gross contractual non-compliance. A reasonable juror could draw from that evidence the conclusion that Appellants were aware of an unreasonable risk that FCM's declining performance would result in a failure to treat or a mistreatment of an inmate's serious medical condition. A reasonable juror could also conclude that, by failing to enforce FCM's compliance with NCCHC standards as required by their contract, Appellants

the background within the department that could actually go out to see if the medical care was provided.").

[18] *See* JA at 366-67 ("Q: As in the other responsibilities, did you have any type of key managers? A: Within the medical? Q: Yes. A: No. It was – no. Q: How is it that you managed the health care issues for inmates? A: That would be working with the
contracted vendor and through the MRC, the Medical Review Committee.").

were deliberately indifferent to the risk that FCM's flagging quality would result in a violation of an inmate's constitutional rights.

Finally, a reasonable juror could find that Barkes's suicide was caused by Appellants' failures to supervise. Despite Barkes's extensive history of mental health problems and multiple suicide attempts (including one at the very prison where he was being held, and two a mere 65 days before his death), the LPN who performed his intake did not place him on even the lowest level of suicide watch. In Appellees' view, had Appellants properly supervised FCM and ensured compliance with the contract, Barkes's answers during his screening would have resulted in additional preventive measures being taken. Of course, it is also true that Barkes did not self-report feelings of suicidal ideation, nor did he exhibit any outward signs of suicidality. But this serves only to highlight the factual nature of this dispute, which neither we nor the District Court on summary judgment are in the position to resolve.

Based on our review of the summary judgment record, we conclude that there remain sufficient factual disputes to preclude a finding that Appellants are entitled to qualified immunity.

## IV.

For the reasons that we have discussed, Appellants are not entitled to qualified immunity. Accordingly, we will affirm the District Court's order and remand for trial.

*Karen Barkes, et al. v. First Correctional Medical Inc., et al.*
No. 12-3074

HARDIMAN, *Circuit Judge*.

Today the Court holds that two of the most senior executives in the Delaware prison system must stand trial for the suicide of Christopher Barkes. In my view, this decision is a classic case of holding supervisors vicariously liable, a practice the Supreme Court proscribed in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The majority accomplishes this feat by attempting to salvage the supervisory liability doctrine we created twenty years before *Iqbal* in *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989). As I shall explain, *Sample* has been abrogated by *Iqbal*. And even assuming I am wrong about *Sample*'s abrogation, Defendants Taylor and Williams are still entitled to summary judgment because Barkes has not complied with *Sample*'s requirement that she identify a specific supervisory practice or procedure that they failed to employ. I respectfully dissent.

I

Christopher Barkes arrived at the HRYCI around 2:45 p.m. on Saturday, November 13, 2004, following his arrest by Wilmington Police for a probation violation. Normally, Barkes would have been taken promptly to the Violation of Probation Center in Sussex County. Because it was the weekend, however, the HRYCI held him as a courtesy because the DOC's transportation department ran only on weekdays. The HRYCI booked and processed Barkes as it would any other inmate, but did not admit him; rather, it held him in the booking and receiving area.

As part of Barkes's intake, the DOC's medical services contractor, First Correctional Medical, Inc. (FCM), conducted a standard medical screening. In doing so, FCM gathered Barkes's medical history and checked his vitals and physical health. FCM also administered a mental health screening intended to, *inter alia*, prevent suicides. FCM's suicide prevention screening test listed seventeen risk factors. Some of those factors automatically triggered suicide protection measures. For example, if an inmate appeared to be under the influence of alcohol or drugs and showed signs of withdrawal or mental illness, FCM would immediately initiate its suicide-prevention protocols and notify a physician. Otherwise, FCM initiated its protocols if the inmate's screening noted eight or more of the seventeen risk factors.[1]

A licensed practical nurse employed by FCM conducted Barkes's medical screening about fifteen minutes after his arrival. At that time, he did not appear depressed, anxious, afraid, or angry, and the arresting officers did not believe Barkes was a suicide risk. Barkes told the nurse that he was not thinking about killing himself. Barkes did admit to a prior suicide attempt in 2003, but he failed to disclose three other suicide attempts, one of which was just two months

---

[1] FCM modeled its suicide prevention screening form on a sample appended to the National Commission on Correctional Health Care's (NCCHC) 1997 standards for prison health services. In 2003, the NCCHC published a new edition of its manual, but FCM continued using its form modeled on the 1997 manual. One year before Barkes's suicide, the NCCHC accredited the HRYCI after reviewing FCM's suicide prevention screening form.

prior to his booking at HRYCI. Based on Barkes's responses during the screening, only two of the seventeen suicide risk factors were indicated: a psychiatric history and a suicide attempt.

The HRYCI correctional staff monitored Barkes throughout Saturday night and Sunday morning. Officers delivered Barkes his breakfast at 8:00 a.m. He was lying awake on his bed when officers observed him at 10:45 a.m., 10:50 a.m., and 11:00 a.m. Sometime between 11:00 a.m. and 11:35 a.m. when they next checked on him, Barkes hanged himself. Officers immediately called FCM staff, who attempted to resuscitate Barkes.

None of the officers watching Barkes noticed anything unusual about him. [2] The only sign that he had been contemplating suicide came in a phone call Barkes made to his wife the night before his death, in which he told her: "I can't live this way anymore." Although Barkes's wife testified that she interpreted this comment as a suicidal threat, she did not advise anyone at the HRYCI of this comment or otherwise alert them that her husband was in distress.

II

The claim at issue—that Barkes was subjected to cruel and unusual punishment in violation of the Eighth Amendment—is premised on the provision of constitutionally inadequate medical care by FCM. Specifically, Barkes

_____

[2] Those same officers were not blind to inmates who turned suicidal. In fact, earlier on the same morning that Barkes died, they transferred a different inmate to the infirmary for suicide prevention.

3

challenges the adequacy of the supervision of FCM's medical staff at the HRYCI. Dr. Tammy Kastre, the President and CEO of FCM, supervised FCM's medical staff at all of Delaware's correctional facilities. The DOC's Bureau of Management Services supervised FCM and Dr. Kastre. The head of that bureau, Joyce Talley, was the DOC's liaison to FCM.[3] Talley tasked her deputy chief, Kathy English, with some of the FCM oversight responsibilities. The formal responsibility for oversight over FCM's compliance with its contract lay with the DOC's Medical Review Committee, which Talley chaired and English co-chaired. Every month, the nine-member committee met with around four FCM representatives. The committee reviewed certain performance measures based on NCCHC standards, such as how long it took FCM to administer its health screening after new inmates were admitted. The committee also reviewed random chart audits. If the DOC had any concerns with FCM's services, it raised them in those meetings.

It is important to note that the liability of none of the persons or entities just mentioned is at issue in this appeal. Instead, Barkes seeks to hold two DOC executives liable:

---

[3] The majority contends that Talley "testified that she did not believe it to be her responsibility to ensure FCM's compliance with NCCHC standards." Maj. Transcript at 8–9. As Talley explained, she "managed the health care issues for inmates" by "working with the contracted vendor and through the [Medical Review Committee]." App. at 806. Any complaints about medical issues "would be presented to the MRC. It was as a group. We were a committee that would oversee the contract." App. at 806.

4

Commissioner Stanley Taylor (Talley's supervisor) and HRYCI Warden Raphael Williams (who was outside the chain of supervision over FCM). [4] The parties agree that neither executive had any personal knowledge of Barkes before his death. In fact, Warden Williams was on vacation while Barkes was at the HRYCI. Commissioner Taylor was scarcely more involved in supervising FCM than Warden Williams; in fact, Delaware law empowered him to designate someone to administer the state's medical services contract, and he appointed Talley to discharge that duty. *See* Del. Code tit.11, § 6517(12). The essence of Barkes's claims against Taylor and Williams is that despite the fact that others were responsible for supervising FCM, "the buck stops" at the top. [5]

---

[4] FCM's medical staff were not employees of the HRYCI and they did not report to Warden Williams. Williams's "participation in health care" at the HRYCI was limited to "provid[ing] access, space, and security for [FCM's] medical staff." App. at 517. When Barkes's lawyer asked Williams whether he "had any responsibilities for the adequate provision of health care to inmates," he answered, "No. That was through management services. That's where the responsibility lied." App. at 517. Another time, Williams testified: "all those policies were by management services. They were tasked with ensuring that FCM followed through with their contractual obligations. That's strictly through them." App. at 792.

[5] The majority states that "Taylor's termination letter to FCM indicates his awareness of FCM's gross contractual non-compliance," and that "[a] reasonable juror could draw from that evidence the conclusion that Appellants were aware

5

When Barkes's widow filed this lawsuit[6] in 2006, her complaint included two section 1983 claims against Taylor and Williams: (1) deliberate indifference to the conditions at the HRYCI; and (2) failure to supervise the DOC personnel and failure to institute appropriate procedures.[7] United States District Court Judge Joseph Farnan granted Taylor and Williams summary judgment on both claims. Barkes's deliberate indifference claim failed because she had not presented sufficient evidence of knowledge by Taylor and Williams of constitutionally inadequate medical conditions at the HRYCI. Her supervisory liability claim failed as a matter of law because she did not satisfy the threshold requirement for supervisory liability we established in *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989), which requires a plaintiff to "identif[y] . . . a specific supervisory practice or procedure that [the supervisor] failed to employ." *Id.* at 1118.

---

of an unreasonable risk." Maj. Transcript at 48. However, the District Court has already recognized that events occurring after Barkes's death, such as Taylor's 2005 letter terminating the DOC's contract with FCM "cannot be probative of Commissioner Taylor's or Warden William[s]'s awareness *in 2004* of a substantial risk." App. at 83.

[6] Plaintiffs are Barkes's widow, Karen, both in her personal and representative capacity, as well as his two daughters. For ease of reference, I refer to Plaintiffs collectively as "Barkes."

[7] Not relevant to this appeal, the complaint also included a wrongful death claim against Taylor and Williams, upon which they were granted summary judgment.

6

Several months after granting Taylor and Williams summary judgment, the District Court granted Barkes leave to file an amended complaint. The Court dismissed that first amended complaint for reprising the claims dismissed on summary judgment. Barkes filed a second amended complaint, which was dismissed for failure to state a claim.

In 2010, following the retirement of Judge Farnan, Barkes's case was reassigned to the Honorable Leonard Stark. Barkes filed a third amended complaint that again sought to hold Taylor and Williams liable under a theory of supervisory liability. Having already suffered a summary judgment on the claim that Taylor and Williams failed to supervise employees of the DOC, Barkes shifted gears to argue that they failed to supervise *FCM*. Once again, Taylor and Williams sought summary judgment, asserting qualified immunity for the first time. Barkes also filed a motion for summary judgment.

Before deciding the parties' summary judgment motions, Judge Stark addressed Barkes's separate motion to vacate the 2006 summary judgment and revive the Eighth Amendment and supervisory liability claims upon which Taylor and Williams had prevailed in 2006 before Judge Farnan. With respect to Barkes's Eighth Amendment claim, the District Court held:

> Assuming, as Plaintiffs appear to argue, that deliberate indifference . . . can be shown by Defendants' deliberate indifference to the medical needs of prisoners such as Barkes himself . . . the Court nonetheless concludes that nothing alters the prior conclusions: a reasonable factfinder could not determine that

7

> Defendants were deliberately indifferent to the risk of suicide.

App. at 15. The District Court also upheld the 2006 summary judgment on Barkes's supervisory liability claim for failure to supervise DOC personnel and failure to institute appropriate suicide prevention policies, concluding: "even assuming that the existing policy created an unreasonable risk of Eighth Amendment injury, there is still not sufficient evidence in the record from which a reasonable factfinder would conclude that Defendants were aware such an unreasonable risk was created and were indifferent to that risk." App. at 16.

After upholding the 2006 summary judgment for want of evidence that Taylor and Williams were aware of and indifferent to an unreasonable risk of suicide, the District Court denied their motion for summary judgment on Barkes's claim that they failed to supervise FCM. In doing so, as the majority implicitly acknowledges, *see* Maj. Typescript at 18, the District Court erred in its application of *Sample* by failing to require Barkes to "identif[y] . . . a specific supervisory practice or procedure that [the supervisor] failed to employ." *Sample*, 885 F.2d at 1118. That is a significant oversight, as this was the decisive element for Judge Farnan in deciding the earlier supervisory liability claim. Taylor and Williams now appeal that ruling, claiming qualified immunity because Barkes did not allege a legally cognizable supervisory liability claim against them and that such a right was not clearly established.

8

III

A

I begin with the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), which altered the legal landscape regarding supervisory liability. Iqbal sued U.S. Attorney General John Ashcroft and F.B.I. Director Robert Mueller, alleging that the conditions of his detention violated his constitutional rights. Iqbal claimed that Ashcroft and Mueller were "liable for knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees." *Id.* at 677 (internal quotation marks deleted). "That is to say, [Iqbal] believe[d] a supervisor's mere knowledge of his subordinate's [unconstitutional] discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* The Court "reject[ed] [the] argument," ruling that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 676–77. The Court continued: "In a § 1983 suit or a *Bivens* action—where masters do not answer for the torts of their servants—the term 'supervisory liability' is a misnomer. Absent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677.

Since *Iqbal*, supervisory liability claims must spring from "actions" or "misconduct," *Iqbal*, 556 U.S. at 676, 677; the mere fact that the supervisor occupied a position of authority is insufficient. Accordingly, the overwhelming weight of authority requires plaintiffs to establish the supervisor's personal involvement in his subordinates' misfeasance. *See Vance v. Rumsfeld*, 701 F.3d 193 (7th Cir.

9

2012) (en banc); *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011); *Porro v. Barnes*, 624 F.3d 1322 (10th Cir. 2010); *Nelson v. Corr. Med. Servs.*, 583 F.3d 522 (8th Cir. 2009) (en banc). *But see Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011) (upholding failure to supervise claim when supervisor was not personally involved, but bore statutory responsibility for plaintiff's injury). The courts of appeals requiring the supervisor's personal involvement—i.e., the Fifth, Seventh, Eighth, and Tenth Circuits—have upheld supervisory liability claims when the challenged policy originates with the supervisor or he contributes to its unlawfulness. *See, e.g.*, *Dodds v. Richardson*, 614 F.3d 1185, 1190 (10th Cir. 2010) (challenging sheriff's accession to unlawful policy of denying bond after hours); *T.E. v. Grindle*, 599 F.3d 583 (7th Cir. 2010) (challenging school principal's active concealment of abuse reports). None of those courts of appeals has upheld a so-called "failure-to" claim, in which subordinates violate the law while the supervisor fails to take remedial action.

Decisions of both the Seventh and Tenth Circuits illustrate the fundamental dichotomy between cases involving the supervisors' personal involvement on the one hand and those relying on the supervisor's position of authority. For example, the Seventh Circuit upheld a supervisory liability claim in *T.E. v. Grindle*, 599 F.3d 583 (7th Cir. 2010), when the plaintiffs "allege[d] that [the principal was] liable for actively concealing reports of abuse and creating an atmosphere that allowed abuse to flourish. In other words, they argue[d] that [the principal's] *own actions* deprived them of their constitutional right." *Grindle*, 599 F.3d at 590

10

(emphasis added).[8] Significantly, the plaintiffs' theory did not rely on the "mere failure of supervisory officials to act." *Id.* The allegations survived *Iqbal* "[b]ecause plaintiffs seek to do no more than hold [the principal] liable 'for . . . her own misconduct.'" *Id.* (quoting *Iqbal*).

Two years after *Grindle* was decided, the Seventh Circuit, sitting en banc, confronted a failure-to-supervise claim in *Vance v. Rumsfeld*, 701 F.3d 193 (7th Cir. 2012) (en banc). Vance sued Secretary of Defense Donald Rumsfeld, alleging that "[Secretary Rumsfeld] received reports that his subordinates sometimes [unlawfully] used [harsh interrogation] techniques . . . and . . . he did not do enough to bring interrogators under control." *Id.* at 203. The Seventh Circuit recognized that after *Iqbal*, "[t]he supervisor can be liable only if he *wants* the unconstitutional or illegal conduct to occur." *Id*. For Vance's deliberate indifference claim, that meant he "would need to allege that Rumsfeld knew of a substantial risk to security contractors' employees, and ignored that risk because he wanted plaintiffs (or similarly situated persons) to be harmed." *Id.* at 204. This was because, absent that showing, supervisory liability claims become claims for vicarious liability. *Id.* "The head of any large bureaucracy receives reports of misconduct. . . . But heads of organizations have never been held liable on the theory that they did not do enough to combat subordinates' misconduct, and the Supreme Court made it clear in *Iqbal* that such theories of liability are unavailing." *Id.* at 204–05. For these

---

[8] Contrary to the majority's view of the case, the *Grindle* plaintiffs alleged much more than that the supervisor-principal "allow[ed] a subordinate teacher to continue working." Maj. Typescript at 23.

11

reasons, the Seventh Circuit granted Secretary Rumsfeld qualified immunity.[9]

---

[9] The majority distinguishes *Vance* on the basis that Secretary Rumsfeld's subordinates violated a federal statute instead of the Eighth Amendment. Although it is true that *Vance* did not involve an Eighth Amendment claim, its analysis on this point relied exclusively on Eighth Amendment case law. It goes without saying that if both a federal statute and the Eighth Amendment embrace the same state of mind, the analysis is identical. The majority and *Vance* both apply *Farmer v. Brennan*, 511 U.S. 825 (1994), a fact obscured by the majority's removal of "But *Farmer v. Brennan,* holds that" in quoting *Vance*. *See* Maj. Typescript at 36 n.10. *Vance*'s unaltered text explains:

> The supervisor must want the forbidden outcome to occur. Deliberate indifference to a known risk is a form of intent. But *Farmer v. Brennan*, 511 U.S. 825 (1994), holds that, to show *scienter* by the deliberate-indifference route, a plaintiff must demonstrate that the public official knew of risks with sufficient specificity to allow an inference that inaction is designed to produce or allow harm.

701 F.3d at 204. One sentence later, the court restated its reliance on *Farmer*:

> Prisons are dangerous places, and misconduct by both prisoners and guards is common. Liability for wardens would be purely vicarious.

12

Like the Seventh Circuit's decision in *Grindle*, the Tenth Circuit's decision in *Dodds v. Richardson*, 614 F.3d 1185 (10th Cir. 2010), did not involve a "failure-to" claim. That case involved a sheriff who violated a state law requiring sheriffs to accept bonds for "persons jailed at times other than the normal working hours." *Id.* at 1190. The sheriff acceded to a county clerk's non-binding policy of forbidding persons charged with felonies from posting bond after hours. *Id.* The Tenth Circuit held that *Iqbal* limited section 1983 liability to "defendants *whose own individual actions* cause a constitutional deprivation because it requires plaintiffs prove each defendant *took some act* with the constitutionally applicable state of mind that caused the alleged constitutional violation." *Id.* at 1200 (emphasis added). It upheld the claim because the plaintiff "presented facts that establish personal involvement" by "show[ing] [the sheriff] may have played more than a passive role in the alleged constitutional

---

*Farmer* rejected a contention that wardens (or guards) can be liable just because they know that violence occurs in prisons and don't do more to prevent it on an institution-wide basis. To get anywhere, [plaintiffs] would need to allege that Rumsfeld knew of a substantial risk to security contractors' employees, and ignored that risk because he wanted plaintiffs (or similarly situated persons) to be harmed.

701 F.3d at 204.

violation—he may have deliberately enforced or actively maintained the policies in question at the jail." *Id.* at 1204.[10]

Unlike the direct involvement alleged in *Dodds*, the Tenth Circuit was presented with a failure-to-supervise claim in *Porro v. Barnes*, 624 F.3d 1322 (10th Cir. 2010). There, an

---

[10] The majority warns that this "rule would have the practical effect of requiring that a supervisor have personal knowledge of an individual inmate, that inmate's particular serious medical need, and of the prison staff's failure to treat that need," Maj. Transcript at 32. In fact, *Dodds* demonstrates the incorrectness of the majority's supposition because there the "Plaintiff [did] not allege [the Supervisor-]Defendant was one of the jail employees who told him and the individuals who inquired about posting bail on his behalf that he could not post the bail . . . . Nor [did the] Plaintiff contend [the Supervisor-]Defendant personally instructed those employees to refuse to accept bail from [the] Plaintiff." *Dodds*, 614 F.3d at 1194.

Separately, the majority attacks this rule with a hypothetical from Judge Hamilton's dissent from *Vance* in which "a local police chief or even the FBI director issued a policy that authorized the use of deadly force," which policy "would be clearly unconstitutional." Maj. Transcript at 34 (quoting *Vance*, 701 F.3d at 223 (Hamilton, J., dissenting)). This hypothetical clearly survives *Dodds* because the policy's unconstitutional quality originates with the supervisor. Judge Hamilton's hypothetical is poles apart from Barkes's complaint, which alleges FCM's policies—not the DOC's—caused the HRYCI's healthcare to deteriorate below the constitutional minimum.

14

inmate who was tasered three times by correctional officers brought a supervisory liability action against the county sheriff. *Id.* at 1324–25. The sheriff did not approve the tasering and was not present when it occurred. *Id.* at 1327. Consistent with *Dodds*, the Tenth Circuit held that "[t]o establish a violation of § 1983 by a supervisor, as with everyone else, then, the plaintiff must establish a *deliberate, intentional act* on the part of the defendant to violate the plaintiff's legal rights." *Id.* at 1327–28 (quotations and alterations omitted) (emphasis added); *see also Dodds*, 614 F.3d at 1195 ("[T]he plaintiff must establish a deliberate, intentional act by the supervisor to violate constitutional rights."). The court rejected the claim against the sheriff "because there [was] no evidence of his *direct personal responsibility* for the force used." *Id.* at 1326 (emphasis in original).

Like the Seventh and Tenth Circuits, the Fifth and Eighth Circuits have rejected similar "failure-to" claims after *Iqbal*. In *Nelson v. Correctional Medical Services*, 583 F.3d 522 (8th Cir. 2009) (en banc), a prison guard shackled the plaintiff's legs during labor, causing permanent injuries while she gave birth. The plaintiff sued the director of the Arkansas Department of Correction, for "[failure] to ensure that proper policies and customs were implemented with respect to the restraint of female inmates in labor." *Id.* at 527. Sitting en banc, the Eighth Circuit held that under *Iqbal* a supervisor is "liable only if he *personally displayed* deliberate indifference to the hazards and pain resulting from shackling an inmate such as [Plaintiff] during the final stages of labor." *Id.* at 535

15

(emphasis added).[11] The court confined its analysis to the polices actually promulgated by the Department of Correction under the director's watch, concluding that the policies showed "administrative concern for the health and safety of pregnant inmates." *Id*. at 536.[12] Noting the absence of the commissioner's "personal involvement," the Eighth Circuit granted qualified immunity. *Id*. On this point, the en banc court was unanimous. *Id.* at 536 (Riley, J., concurring in part and dissenting in part). The Fifth Circuit has likewise narrowed supervisory liability to conform to *Iqbal*: "Beyond [the supervisor's] own conduct, the extent of his liability as a supervisor is similar to that of a municipality that implements

---

[11] The Eighth Circuit reiterated this point in *Whitson v. Stone County Jail*, 602 F.3d 920 (8th Cir. 2010), when it stated that prison supervisors can be liable on an Eighth Amendment claim "only if they personally displayed deliberate indifference to the risk" of a constitutional deprivation. *Id.* at 927–28.

[12] Just as *Nelson* approved of the Arkansas Department of Correction's policies expressed in its regulations, we would not hesitate to approve of the Delaware Department of Correction's policy expressed in its contract that requires FCM "to implement 'Best Practices' from State Correctional Services" for mental health care if Barkes challenged the DOC's policies. App. at 138. That analysis is unnecessary, however, because Barkes does not challenge the DOC's policies.

16

an unconstitutional policy." *Carnaby v. City of Houston*, 636 F.3d 183, 189 (5th Cir. 2011).[13]

The Ninth Circuit's decision in *Al-Kidd v. Ashcroft*, 580 F.3d 949 (9th Cir. 2009), *overruled on other grounds*, 131 S. Ct. 2074 (2011), aligns with these authorities. In that case, the government detained the plaintiff under the authority of the federal material witness statute and held him for suspected terrorist activity. The plaintiff brought a supervisory liability action against Attorney General John Ashcroft alleging two violations of the law. First, that Ashcroft "purposefully used the material witness statute" to unlawfully detain persons and that Ashcroft "designed and implemented" this policy. *Id.* at 957, 976.[14] That claim

---

[13] The First Circuit's pre-*Iqbal* case law already required "an affirmative link between the behavior of a subordinate and the action or inaction of his supervisor . . . such that the supervisor's conduct led inexorably to the constitutional violation." *Soto-Torres v. Fraticelli*, 654 F.3d 153, 158 (1st Cir. 2011) (quoting *Pineda v. Toomey*, 533 F.3d 50, 54 (1st Cir. 2008)) (internal quotation marks omitted); *see also Sanchez v. Pereira-Castillo*, 590 F.3d 31, 49 (1st Cir. 2009) (quoting *Camilo-Robles v. Zapata*, 175 F.3d 41, 44 (1st Cir. 1999)). Whether this standard satisfies *Iqbal* remains a question of first impression for the First Circuit, however. *Soto-Torres*, 654 F.3d at 158 n.7; *Maldonado v. Fontanes*, 568 F.3d 263, 274 n.7 (1st Cir. 2009).

[14] The majority reads *Al-Kidd* as "suggest[ing] that under *Iqbal* the United States Attorney General could be liable for knowingly 'fail[ing] to act in the light of even unauthorized abuses.'" Maj. Typescript at 21. In fact, the

17

survived Ashcroft's qualified immunity defense because, "unlike in *Iqbal*, these [were] not bare allegations that the Attorney General 'knew of' the policy. Here, the complaint contain[ed] allegations that plausibly suggest that Ashcroft purposely instructed his subordinates to bypass the plain reading of the statute." *Id.* at 976. The second supervisory liability claim sought to hold Ashcroft liable for subjecting the plaintiff to "unreasonably punitive conditions of confinement" during his detention. *Id.* at 957. The Ninth Circuit granted Ashcroft qualified immunity on this claim because "the complaint [did] not allege any specific facts—such as statements from Ashcroft or from high ranking officials in the DOJ—establishing that Ashcroft had personal involvement in setting the conditions of confinement." *Id.* at 978. Neither claim required the court to decide whether the "knowing failure to act standard" survived *Iqbal*, and it reserved judgment on that question. *Id.* at 976 n.25.[15]

---

Ninth Circuit took pains to ensure that its decision was not read for that proposition: "We need not address whether [the 'knowing failure to act' standard survived *Iqbal*] because al-Kidd plausibly pleads 'purpose' rather than just 'knowledge' to impose liability on Ashcroft." *Al-Kidd v. Ashcroft*, 580 F.3d 949, 976 n.25 (9th Cir. 2009).

[15] Although the *Al-Kidd* majority explained that its decision relied on the plaintiff's pleadings of purpose and not a failure to act, Judge Bea perceived otherwise and dissented from the decision on this point, saying "it is doubtful that the majority's knowing failure to act standard survived *Iqbal*." 580 F.3d at 992 n.13 (Bea, J., dissenting).

18

When the Ninth Circuit faced a "failure-to" claim in *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011), it departed from the approaches taken by the Fifth, Seventh, Eighth, and Tenth Circuits. Contrary to the other four courts of appeals, the Ninth Circuit upheld an Eighth Amendment supervisory liability claim against a sheriff "because he knew or should have known about the dangers in the [jail], and . . . was deliberately indifferent to those dangers." *Id.* at 1204–05. The plaintiff's complaint contained detailed allegations concerning the sheriff's knowledge of his subordinates' unlawfulness.[16] In determining the sheriff's culpability for his

---

[16] It is worth noting that Barkes's allegations of knowledge by Taylor and Williams come nowhere near the facts averred by the *Starr* plaintiff:

> Starr specifically alleges numerous incidents in which inmates in Los Angeles County jails have been killed or injured because of the culpable actions of the subordinates of Sheriff Baca. The complaint specifically alleges that Sheriff Baca was given notice of all of these incidents. It specifically alleges, in addition, that Sheriff Baca was given notice, in several reports, of systematic problems in the county jails under his supervision that have resulted in these deaths and injuries.

652 F.3d at 1216. On the question of knowledge, Barkes alleges merely that Taylor and Williams "were aware that the suicide rate in Delaware prisons was above the national average," that they knew "jailed detainees have a higher incidence of suicide than incarcerated inmates" but "there

19

inaction, however, the Court permitted the claim to go forward because a state statute held the sheriff "answerable for the prisoner's safekeeping." *Id.* at 1208. In a vigorous dissent, Judge Trott claimed that the "complaint has all the hallmarks of an attempted end run around the prohibition against using the vicarious liability doctrine of respondeat superior to get at the boss." *Id.* at 1217 (Trott, J., dissenting). In his view, "simply alleging generally that the Sheriff is answerable for the prisoner's safe-keeping doesn't cut it." *Id.*[17]

---

was only one suicide prevention policy applicable to both," and that both were "aware that the first twenty-four hours of a jailed detainee's detention were a time of high-suicide risk." App. at 171–72.

[17] Although no statute holds Taylor and Williams responsible for medical conditions at the HRYCI, Judge Trott's observations apply equally well to this appeal:

> Sadly, bad things routinely happen in the best of jails. The same is true of hospitals, armies, churches, nursing homes, synagogues, boy scout troops, and legislatures. To attach personal legal liability to the leaders of these organizations, however, requires much more than, "Well, she must have known and must have been deliberately indifferent, because after all, it happened on her watch."

*Starr*, 652 F.3d at 1219 (Trott, J., dissenting).

B

Barkes's allegations are inadequate under any of our sister circuits' interpretations of *Iqbal*. Barkes argues that FCM acted unlawfully in providing medical care at the HRYCI, and she would hold Taylor and Williams liable because they allegedly knew that FCM provided constitutionally inadequate medical care and failed to cure FCM's deficiencies. But nothing in the pleadings alleges that Taylor and Williams "personally displayed deliberate indifference," *Nelson*, 585 F.3d at 535, committed a "deliberate, intentional act," *Porro*, 624 F.3d at 1327–28; *Dodds*, 614 F.3d at 1195, or "wanted plaintiffs (or similarly situated persons) to be harmed." *Vance*, 701 F.3d at 204. Nor does Barkes challenge any of the policies promulgated by the DOC. In fact, she does the opposite, citing with approval the DOC's contract requiring FCM to use "[b]est [p]ractices" for mental health care as proof of wrongdoing. App. at 138. Barkes has alleged nothing beyond knowledge on the part of Taylor and Williams. She complains that Taylor spent "'very little' time on prison health care issues, delegating the responsibility to others." App. at 172. But after *Iqbal*, that fact alone merits a dismissal because Barkes must establish that Taylor and Williams "played more than a passive role in the alleged constitutional violation." *Dodds*, 614 F.3d at 1204. Claims brought because—in Barkes's words—the supervisor "presided over a system" fall well short of the standard established in *Iqbal*. App. at 745.

Barkes's claim fails even under the Ninth Circuit's approach in *Starr*. That opinion applied a pure deliberate indifference standard without a personal involvement requirement. Unlike in *Starr*, here no statute holds either Commissioner Taylor or Warden Williams "answerable" for

21

medical care in Delaware prisons. In fact, a Delaware statute does the opposite insofar as it empowered Taylor to appoint a designee to administer the medical services contract. *See* Del. Code tit.11, § 6517(12). He did just that, charging the DOC's bureau of management services with this duty. And as for Warden Williams, Barkes's claim is completely unsupported because he had no supervisory authority over FCM. FCM "answer[ed]" to Talley, but not to Taylor or Williams. *See Starr*, 652 F.3d at 1208. Barkes might have a cognizable supervisory liability suit against Talley under *Starr*, but not against two senior executives who did not supervise FCM. Unsurprisingly, when both Judges Farnan and Stark viewed Barkes's allegations through a pure deliberate indifference lens, they too concluded that "a reasonable factfinder could not determine that Defendants were deliberately indifferent to the risk of suicide." App. at 15, 82–82.

C

In light of *Iqbal*, we must also overrule the framework we adopted for supervisory liability claims in *Sample v. Diecks*, 885 F.2d 1099 (3d Cir. 1989). The absence of deliberate indifference has not proven fatal to Barkes's claim because the majority has determined that Barkes's claim should be measured not by a pure deliberate indifference standard but by *Sample*, which enunciated a test unique to the supervisory context. The majority upholds *Sample*, noting that our old supervisory liability test already required the plaintiff to show deliberate indifference. Maj. Typescript at 23–24. True though that statement is, it fails to recognize that *Sample*'s version of deliberate indifference differs markedly from the subjective version of deliberate indifference required under the Eighth Amendment and omits the personal involvement requirement that all but one of our sister circuits

22

have required. First, *Sample* does not require the supervisor's actual knowledge. Its version of deliberate indifference is objective, *Sample*, 885 F.2d at 1118, meaning that a plaintiff could establish deliberate indifference by establishing that the supervisor *should have* known of the excessive risk to inmate health and safety even if the plaintiff admits the supervisor actually had no such awareness.

*Sample*'s objective quality is patent, insofar as it fashioned a test based on the objective deliberate-indifference standard that the Supreme Court established for municipal liability in *City of Canton v. Harris*, 489 U.S. 378 (1989). In *Sample*, we actually grappled with the fact that the record before us did not indicate that the supervisor had actual knowledge of the allegedly constitutionally inadequate prison procedures. *Sample*, 885 F.2d at 1118. But we answered that under *Canton*,

> this absence of prior incidents and knowledge thereof is not necessarily fatal to Sample's case. As we have noted, [*Canton*] observed that there are situations in which the risk of constitutionally cognizable harm is so great and so obvious that the risk and the failure of supervisory officials to respond will alone support findings of the existence of an unreasonable risk, of knowledge of that unreasonable risk, and of indifference to it.

*Id.* The majority admits that this part of the test we expressed in *Sample* is untenable today. Maj. Typescript at 31–32. Nevertheless, after denuding *Sample* of its objective quality, the majority upholds a test that does not require the plaintiff to plead personal involvement by the supervisor. Under

23

*Sample*, the plaintiff need only establish a "supervisory practice or procedure that [the supervisor] failed to employ." *Sample*, 885 F.2d at 1118. That is a far cry from the "personally displayed deliberate indifference," *Nelson*, 585 F.3d at 535, or "deliberate, intentional act," *Porro*, 624 F.3d at 1327–28; *Dodds*, 614 F.3d at 1195, that our sister circuits have required after *Iqbal*.

"Simply put, there's no special rule of liability for supervisors. The test for them is the same as the test for everyone else." *Porro*, 624 F.3d at 1328. None of the cases discussed—not even the Ninth Circuit's decision in *Starr*—has upheld a special test that applies only to supervisors. The majority disagrees, saying *Sample*'s "essence" is deliberate indifference, Maj. Transcript at 24, so we should continue to treat supervisors differently. Only by doing so, can the majority circumvent the District Court's prior holdings that the record does not show deliberate indifference. App. at 15.[18] *Sample*'s unique combination of elements applies only to the supervisory form of deliberate indifference and permits Barkes to take her claim to trial without alleging Taylor and Williams's personal involvement.

---

[18] The majority argues Barkes's earlier claims are distinct, Maj. Transcript at 31, but it is a distinction without a difference. Whether Barkes argues Taylor and Williams failed to supervise DOC staff (as in the earlier claim) or FCM (as in the claim at issue now), knowledge and indifference is the common thread, and the fact that "there is still not sufficient evidence in the record from which a reasonable factfinder would conclude that Defendants were aware such an unreasonable risk was created and were indifferent to that risk" is fatal. App. at 16.

24

With due respect to my colleagues' concern that *Iqbal* has "bedeviled" the courts of appeals, Maj. Typescript at 20, I perceive near unanimous agreement among our sister circuits. Barkes's claim plainly seeks to hold Taylor and Williams vicariously liable for, in Barkes's words, "presid[ing] over a system," App. at 745, that she deems unlawful. Today's decision invites plaintiffs to sue senior government officials whenever prison guards use force against an inmate or police officers mistreat a suspect. Regrettably, it exposes Commissioner Taylor and Delaware's prison wardens to lawsuits from any Delaware inmate with a complaint about FCM's services. "In an ideal world, [supervisors] would have achieved full compliance with the [law], but a public official's inability to ensure that all subordinate . . . employees follow the law has never justified personal liability. . . . [S]upervisors are not vicariously liable for their subordinates' transgressions." *Vance*, 701 F.3d at 203.

For these reasons, I would reverse the District Court's denial of Taylor and Williams's motion for summary judgment on qualified immunity. *See Dodds v. Richardson*, 614 F.3d 1185, 1194 (10th Cir. 2010) (explaining that questions of supervisory liability, though part of the substance of a section 1983 claim, are also part of the qualified immunity analysis); *al-Kidd v. Ashcroft*, 580 F.3d 949, 964–65 (9th Cir. 2009) (same). None of the courts that have considered *Iqbal* have applied a standard like *Sample*'s, as the majority does today. The District Court's prior decision that Barkes cannot prove Taylor and Williams's deliberate indifference combined with the absence of any allegation of personal involvement on their part, entitles them to qualified immunity.

25

IV

Even had *Iqbal* not substantially changed the law of supervisory liability and had *Sample* remained good law, I would still hold that Taylor and Williams are entitled to summary judgment. According to *Sample*, the test for supervisory liability is as follows:

> Based on *City of Canton*, we conclude that a judgment could not properly be entered against [the supervisor] in this case based on supervisory liability absent an identification by [the plaintiff] of a specific supervisory practice or procedure that [the supervisor] failed to employ and specific findings by the district court that (1) the existing custom and practice without that specific practice or procedure created an unreasonable risk of prison overstays, (2) [the supervisor] was aware that this unreasonable risk existed, (3) [the supervisor] was indifferent to that risk, and (4) [the subordinate's constitutional tort] resulted from [the supervisor's] failure to employ that supervisory practice or procedure.

885 F.2d at 1118. The District Court erred by omitting *Sample*'s threshold prerequisite, namely, that the plaintiff identify "a specific supervisory practice or procedure that [the supervisor] failed to employ." *Id.*; *accord* Maj. Typescript at 18. It applied only *Sample*'s enumerated elements without ever requiring Barkes to identify a supervisory practice and misstated *Sample*'s causation element by omitting the identified supervisory practice. Judge Farnan properly applied *Sample* when he granted Taylor and Williams summary

26

judgment on Barkes's first supervisory liability claim, and his analysis turned on *Sample*'s threshold element. And although the majority has accurately spelled out the *Sample* test—implicitly recognizing the District Court's error—it errs in concluding that Barkes has satisfied this essential element.

Barkes's complaint does not even attempt to make the identification required by *Sample*. Nevertheless, according to the majority:

> Appellees claim that Taylor and Williams should have enforced FCM's compliance with their contractual obligations, specifically by requiring FCM to adhere to up-to-date NCCHC standards, by properly administering the standards to which they adhered, and by requiring mental health screenings to have been conducted by a qualified mental health professional rather than an unqualified LPN, thus satisfying *Sample*'s threshold requirement.

Maj. Typescript at 46. The majority does not say where Barkes makes this contract enforcement allegation and my review of the pleadings failed to locate it either.

But even if Barkes *had* made this allegation, her *Sample* claim would fail because "enforcing" a contract is not "a supervisory practice or procedure." *Sample*'s threshold element forces the plaintiff to explain not just that the supervisor failed to act, but also what he should have done differently. As we cautioned in *Sample*:

> [I]t is not enough for a plaintiff to argue that the constitutionally cognizable injury would not

27

have occurred if the superior had done more than he or she did. The district court must insist that [the plaintiff] identify specifically what it is that [the supervisor] failed to do that evidences his deliberate indifference. Only in the context of a specific defalcation on the part of the supervisory official can the court assess whether the official's conduct evidenced deliberate indifference and whether there is a close causal relationship between the "identified deficiency" and the "ultimate injury."

885 F.2d at 1118. Barkes's contention that Taylor and Williams should have enforced the contract fails to meet our specificity requirements. The relevant question is: what "supervisory practice or procedure" should Taylor or Williams have implemented to enforce the contract? Commissioner Taylor already tasked a bureau with enforcing the FCM contract, and Warden Williams had no supervisory responsibilities over FCM. Pursuant to Delaware law, Joyce Talley, the chief of the DOC's Bureau of Management Services, supervised FCM. Barkes's utter failure to satisfy this element of *Sample*'s test underscores the fact that neither Taylor nor Williams supervised FCM. Barkes has targeted them merely as top-level DOC executives.

Even had *Sample* survived *Iqbal*, Taylor and Williams would be entitled to summary judgment. Judge Farnan granted them summary judgment on the first supervisory liability claim because Barkes failed to meet *Sample*'s threshold requirement. Barkes did not allege in her third amended complaint a specific supervisory practice that Taylor and Williams should have performed, and any allegations that Taylor and Williams should have "enforced" the contract

28

would do nothing to cure that omission. The District Court should have granted Taylor's and Williams's motion for summary judgment on the supervisory liability claim for the same reasons Judge Farnan did on the earlier supervisory liability claim.

V

Finally, I disagree with the majority's formulation of the constitutional right at issue. In addition to challenging the viability of supervisory liability after *Iqbal*, Taylor and Williams argued that Barkes's asserted right was not "clearly established." If true, that would also entitle them to qualified immunity. *See Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012). They argued that our case law had not clearly established a right "to supervision of the medical vendor by the prison administrators." Br. of Appellants at 19. The majority responds by stating "that the right [Barkes] assert[s], properly defined, is this: an incarcerated person's right to the proper implementation of adequate suicide prevention protocols." Maj. Typescript at 40. This is problematic for two reasons. First, the description of a right to suicide prevention protocols does not address Taylor and Williams's argument that there is no clearly established right to supervision over those charged with developing and carrying out suicide prevention protocols since this supposed right concerns FCM's responsibilities.[19]

---

[19] I disagree with the majority's belief that *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004), established a right to supervision for a simple reason: *Spruill* was not a supervisory liability case, and the defendant had no supervisory relationship with the medical staff.

29

The more concerning error is that the majority's articulation of the constitutional right departs from the Eighth Amendment case law. The majority claims this right "to the proper implementation of adequate suicide prevention protocols," Maj. Typescript at 40, is established in our precedents, but it cites no case for this proposition, and I have found none. Indeed, the majority's description of a right to "adequate suicide prevention protocols" (and for that matter, Barkes's contention that FCM's administration of the NCCHC's 1997 standards by an LPN amounts to cruel and unusual punishment) would appear to be inconsistent with the weight of authority on this question. *See, e.g.*, *Jenkins v. Cnty. of Hennepin*, 557 F.3d 628, 633 (8th Cir. 2009) (plaintiff's allegations "that the Detention Center's intake procedures were insufficient to identify certain types of serious injuries" failed because "the range of acceptable medical care is broad. Jailers bear only the responsibility to identify medical needs that are so obvious that even a layperson would easily recognize the necessity for a doctor's attention."); *Brumfield v. Hollins*, 551 F.3d 322, 328 (5th Cir. 2008) (granting defendants summary judgment where jail had no written policy but an oral policy required officers to place a detainee in an observation cell if the detainee appeared suicidal); *Belcher v. Oliver*, 898 F.2d 32, 34–35 (4th Cir. 1990) ("The general right of pretrial detainees to receive basic medical care does not place upon jail officials the responsibility to screen every detainee for suicidal tendencies.").

Even if it were true that clearly established law mandated "adequate suicide prevention protocols," the majority's requirement of the "proper implementation" of those protocols plainly violates the basic proposition that the Eighth Amendment does not impose liability for negligence.

*See Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1024 (3d Cir. 1991). "Failure to follow written procedures does not constitute *per se* deliberate indifference. If this were so, such a rule would create an incentive for jails to keep their policies vague, or not formalize policies at all." *Luckert v. Dodge Cnty.*, 684 F.3d 808, 819 (8th Cir. 2012) (granting supervisor qualified immunity when the prison's "actual practice in dealing with suicide intervention . . . did not reflect [the prison's] written policy").

* * *

Barkes has targeted Taylor and Williams for "presid[ing] over a system." App. at 745. This runs afoul of *Iqbal* and the substantial weight of authority among our sister courts, which holds that supervisors like Taylor and Williams cannot be liable under section 1983 absent their personal involvement. Even under the Ninth Circuit's approach, Barkes would need to sue the person actually supervising FCM and cannot recover against the DOC's top executives. None of the courts of appeals since *Iqbal* have upheld a supervisory liability test like *Sample*'s, which treats supervisors differently from everyone else.

Even assuming *arguendo* that *Sample* remains good law, Barkes's allegation that Taylor and Williams failed to enforce a contract with FCM does not satisfy *Sample*'s threshold element. Finally, the "right to the proper implementation of adequate suicide prevention protocols" is a departure from Eighth Amendment case law that had never been established before today. Because Taylor and Williams are entitled to summary judgment on the grounds of qualified immunity, I respectfully dissent.